NATIONAL LABOR RELATIONS BOARD *v.*
BROWN ET AL., DBA BROWN FOOD
STORE, ET AL.

No. 7. Argued January 19, 1965.—Decided March 29, 1965.

*Norton J. Come* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Arnold Ordman, Dominick L. Manoli, Gary Green* and *Nathan Lewin.*

*William L. Keller* argued the cause for respondents. With him on the brief was *Allen Butler.*

*S. G. Lippman* and *Tim L. Bornstein* filed a brief for the Retail Clerks International Association, as *amicus curiae,* urging reversal.

*Joseph M. McLaughlin* and *Frederick A. Morgan* filed a brief for Food Employers Council, Inc., et al., as *amici curiae,* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The respondents, who are members of a multiemployer bargaining group, locked out their employees in response

to a whipsaw strike against another member of the group. They and the struck employer continued operations with temporary replacements. The National Labor Relations Board found that the struck employer's use of temporary replacements was lawful under *Labor Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333, but that the respondents had violated §§ 8 (a)(1) and (3) of the National Labor Relations Act [1] by locking out their regular employees and using temporary replacements to carry on business. 137 N. L. R. B. 73. The Court of Appeals for the Tenth Circuit disagreed and refused to enforce the Board's order. 319 F. 2d 7. We granted certiorari, 375 U. S. 962. We affirm the Court of Appeals.

Five operators of six retail food stores in Carlsbad, New Mexico, make up the employer group. The stores had bargained successfully on a group basis for many years with Local 462 of the Retail Clerks International Association. Negotiations for a new collective-bargaining agreement to replace the expiring one began in January 1960. Agreement was reached by mid-February on all

---

[1] National Labor Relations Act, as amended, § 8 (a), 61 Stat. 140, 29 U. S. C. § 158 (a) (1958 ed.) provides: "It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.        .        .        .        .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

National Labor Relations Act, as amended, § 7, 61 Stat. 140, 29 U. S. C. § 157 (1958 ed.) provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment . . . ."

terms except the amount and effective date of a wage increase. Bargaining continued without result, and on March 2 the Local informed the employers that a strike had been authorized. The employers responded that a strike against any member of the employer group would be regarded as a strike against all. On March 16, the union struck Food Jet, Inc., one of the group. The four respondents, operating five stores, immediately locked out all employees represented by the Local, telling them and the Local that they would be recalled to work when the strike against Food Jet ended. The stores, including Food Jet, continued to carry on business by using management personnel, relatives of such personnel, and a few temporary employees; all of the temporary replacements were expressly told that the arrangement would be discontinued when the whipsaw strike ended.[2] Bargaining continued until April 22 when an agreement was reached. The employers immediately released the temporary replacements and restored the strikers and the locked-out employees to their jobs.

The Board and the Court of Appeals agreed that the case was to be decided in light of our decision in the so-called *Buffalo Linen* case, *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87. There we sustained the Board's finding that, in the absence of specific proof of unlawful motivation, the use of a lockout by members of a multiemployer bargaining unit in response to a whipsaw strike did

---

[2] Food Jet used supervisory personnel and hired some "sack boys"; respondent Safeway Stores, which operated two stores in Carlsbad, closed one and transferred its managerial personnel to the other; respondent Thrifty Way Food Stores used management personnel and their wives and also hired some part-time "box boys"; respondent Brown Food Store relied on management personnel and their relatives, and a "sack boy" transferred from an out-of-town branch store; respondent Cashway Food Stores also relied on management personnel and their relatives and some transferees from out-of-town branches.

not violate either § 8 (a) (1) or § 8 (a) (3). We held that, although the lockout tended to impair the effectiveness of the whipsaw strike, the right to strike "is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide. . . . The ultimate problem is the balancing of the conflicting legitimate interests." 353 U. S., at 96. We concluded that the Board correctly balanced those interests in upholding the lockout, since it found that the nonstruck employers resorted to the lockout to preserve the multiemployer bargaining unit from the disintegration threatened by the whipsaw strike. But in the present case the Board held, two members dissenting, that the respondents' continued operations with temporary replacements constituted a "critical difference" from *Buffalo Linen*—where all members of the employer group shut down operations—and that in this circumstance it was reasonable to infer that the respondents did not act to protect the multiemployer group, but "for the purpose of inhibiting a lawful strike." 137 N. L. R. B., at 76. Thus the respondents' act was both a coercive practice condemned by § 8 (a) (1) and discriminatory conduct in violation of § 8 (a) (3).

The Board's decision does not rest upon independent evidence that the respondents acted either out of hostility toward the Local or in reprisal for the whipsaw strike. It rests upon the Board's appraisal that the respondents' conduct carried its own indicia of unlawful intent, thereby establishing, without more, that the conduct constituted an unfair labor practice. It was disagreement with this appraisal, which we share, that led the Court of Appeals to refuse to enforce the Board's order.

It is true that the Board need not inquire into employer motivation to support a finding of an unfair labor practice where the employer conduct is demonstrably destructive of employee rights and is not justified by the service of significant or important business ends. See, *e. g., Labor*

*Board* v. *Erie Resistor Corp.*, 373 U. S. 221; *Labor Board* v. *Burnup & Sims, Inc.*, 379 U. S. 21. We agree with the Court of Appeals that, in the setting of this whipsaw strike and Food Jet's continued operations, the respondents' lockout and their continued operations with the use of temporary replacements, viewed separately or as a single act, do not constitute such conduct.

We begin with the proposition that the Act does not constitute the Board as an "arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands." *Labor Board* v. *Insurance Agents*, 361 U. S. 477, 497. In the absence of proof of unlawful motivation, there are many economic weapons which an employer may use that either interfere in some measure with concerted employee activities, or which are in some degree discriminatory and discourage union membership, and yet the use of such economic weapons does not constitute conduct that is within the prohibition of either § 8 (a)(1) or § 8 (a)(3). See, *e. g., Labor Board* v. *Mackay Radio & Telegraph Co., supra; Labor Board* v. *Dalton Brick & Tile Corp.*, 301 F. 2d 886, 896. Even the Board concedes that an employer may legitimately blunt the effectiveness of an anticipated strike by stockpiling inventories, readjusting contract schedules, or transferring work from one plant to another, even if he thereby makes himself "virtually strikeproof." [3] As a general matter he may completely liquidate his business without violating either § 8 (a)(1) or § 8 (a)(3), whatever the impact of his action on concerted employee activities. *Texile Workers* v. *Darlington Mfg. Co.*, Nos. 37 and 41, decided today, *ante,* p. 263. Specifically, he may in various circumstances use the lockout as a legitimate economic weapon. See, *e. g., Labor Board* v. *Truck*

---

[3] See brief for the National Labor Relations Board in *American Ship Building Co.* v. *Labor Board,* No. 255, *post,* p. 300, also decided today, at p. 17. See also 76 Harv. L. Rev. 1494, 1497.

*Drivers Union, supra; Labor Board* v. *Dalton Brick & Tile Corp., supra; Leonard* v. *Labor Board,* 205 F. 2d 355; *Betts Cadillac Olds, Inc.,* 96 N. L. R. B. 268; *International Shoe Co.,* 93 N. L. R. B. 907; *Pepsi-Cola Bottling Co.,* 72 N. L. R. B. 601, 602; *Duluth Bottling Assn.,* 48 N. L. R. B. 1335; *Link-Belt Co.,* 26 N. L. R. B. 227. And in *American Ship Building Co.* v. *Labor Board,* No. 255, decided today, *post,* p. 300, we hold that a lockout is not an unfair labor practice simply because used by an employer to bring pressure to bear in support of his bargaining position after an impasse in bargaining negotiations has been reached.

In the circumstances of this case, we do not see how the continued operations of respondents and their use of temporary replacements imply hostile motivation any more than the lockout itself; nor do we see how they are inherently more destructive of employee rights. Rather, the compelling inference is that this was all part and parcel of respondents' defensive measure to preserve the multiemployer group in the face of the whipsaw strike. Since Food Jet legitimately continued business operations, it is only reasonable to regard respondents' action as evincing concern that the integrity of the employer group was threatened unless they also managed to stay open for business during the lockout. For with Food Jet open for business and respondents' stores closed, the prospect that the whipsaw strike would succeed in breaking up the employer association was not at all fanciful. The retail food industry is very competitive and repetitive patronage is highly important. Faced with the prospect of a loss of patronage to Food Jet, it is logical that respondents should have been concerned that one or more of their number might bolt the group and come to terms with the Local, thus destroying the common front essential to multiemployer bargaining. The Court of Appeals correctly pictured the respondents' dilemma in saying,

"If . . . the struck employer does choose to operate with replacements and the other employers cannot replace after lockout, the economic advantage passes to the struck member, the non-struck members are deterred in exercising the defensive lockout, and the whipsaw strike . . . enjoys an almost inescapable prospect of success." 319 F. 2d, at 11. Clearly respondents' continued operations with the use of temporary replacements following the lockout were wholly consistent with a legitimate business purpose.

Nor are we persuaded by the Board's argument that justification for the inference of hostile motivation appears in the respondents' use of temporary employees rather than some of the regular employees. It is not commonsense, we think, to say that the regular employees were "willing to work at the employers' terms." 137 N. L. R. B., at 76. It seems probable that this "willingness" was motivated as much by their understandable desire to further the objective of the whipsaw strike—to break through the employers' united front by forcing Food Jet to accept the Local's terms—as it was by a desire to work for the employers under the existing unacceptable terms. As the Board's dissenting members put it, "These employees are willing only to receive wages while their brethren in the rest of the associationwide unit are exerting whipsaw pressure on one employer to gain benefits that will ultimately accrue to all employees in the associationwide unit, including those here locked out." 137 N. L. R. B., at 78. Moreover, the course of action to which the Board would limit the respondents would force them into the position of aiding and abetting the success of the whipsaw strike and consequently would render "largely illusory," 137 N. L. R. B., at 78–79, the right of lockout recognized by *Buffalo Linen;* the right would be meaningless if barred to nonstruck stores that find it necessary to operate because the struck store does so.

The Board's finding of a § 8 (a)(1) violation emphasized the impact of respondents' conduct upon the effectiveness of the whipsaw strike. It is no doubt true that the collective strength of the stores to resist that strike is maintained, and even increased, when all stores stay open with temporary replacements. The pressures on the employees are necessarily greater when none of the union employees is working and the stores remain open. But these pressures are no more than the result of the Local's inability to make effective use of the whipsaw tactic. Moreover, these effects are no different from those that result from the legitimate use of any economic weapon by an employer. Continued operations with the use of temporary replacements may result in the failure of the whipsaw strike, but this does not mean that the employers' conduct is demonstrably so destructive of employee rights and so devoid of significant service to any legitimate business end that it cannot be tolerated consistently with the Act. Certainly then, in the absence of evidentiary findings of hostile motive, there is no support for the conclusion that respondents violated § 8 (a)(1).

Nor does the record show any basis for concluding that respondents violated § 8 (a)(3). Under that section both discrimination and a resulting discouragement of union membership are necessary, but the added element of unlawful intent is also required. In *Buffalo Linen* itself the employers treated the locked-out employees less favorably because of their union membership, and this may have tended to discourage continued membership, but we rejected the notion that the use of the lockout violated the statute. The discriminatory act is not by itself unlawful unless intended to prejudice the employees' position because of their membership in the union; some element of antiunion animus is necessary. See *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, 42–44; *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301

U. S. 1, at 46. We have determined that the "real motive" of the employer in an alleged § 8 (a)(3) violation is decisive, *Associated Press* v. *Labor Board,* 301 U. S. 103, 132; if any doubt still persisted, we laid it to rest in *Radio Officers' Union* v. *Labor Board, supra,* where we reviewed the legislative history of the provision and concluded that Congress clearly intended the employer's purpose in discriminating to be controlling. *Id.,* at 44. See also *Textile Workers* v. *Darlington Mfg. Co., ante,* at 275, 276; *American Ship Building Co.* v. *Labor Board, post,* at 311–313; *Local 357, International Brotherhood of Teamsters* v. *Labor Board,* 365 U. S. 667, 674–676.

We recognize that, analogous to the determination of unfair practices under § 8 (a)(1), when an employer practice is inherently destructive of employee rights and is not justified by the service of important business ends, no specific evidence of intent to discourage union membership is necessary to establish a violation of § 8 (a)(3). This principle, we have said, is "but an application of the common-law rule that a man is held to intend the foreseeable consequences of his conduct." *Radio Officers' Union* v. *Labor Board, supra,* at 45. For example, in *Labor Board* v. *Erie Resistor Corp., supra,* we held that an employer's action in awarding superseniority to employees who worked during a strike was discriminatory conduct that carried with it its own indicia of improper intent. The only reasonable inference that could be drawn by the Board from the award of superseniority—balancing the prejudicial effect upon the employees against any asserted business purpose—was that it was directed against the striking employees because of their union membership; conduct so inherently destructive of employee interests could not be saved from illegality by an asserted overriding business purpose pursued in good faith. But where, as here, the tendency to discourage union membership is comparatively slight, and the em-

ployers' conduct is reasonably adapted to achieve legitimate business ends or to deal with business exigencies, we enter into an area where the improper motivation of the employers must be established by independent evidence. When so established, antiunion motivation will convert an otherwise ordinary business act into an unfair labor practice. *Labor Board* v. *Erie Resistor Corp., supra,* at 227, and cases there cited.

We agree with the Court of Appeals that respondents' conduct here clearly fits into the latter category, where actual subjective intent is determinative, and where the Board must find from evidence independent of the mere conduct involved that the conduct was primarily motivated by an antiunion animus. While the use of temporary nonunion personnel in preference to the locked-out union members is discriminatory, we think that any resulting tendency to discourage union membership is comparatively remote, and that this use of temporary personnel constitutes a measure reasonably adapted to the effectuation of a legitimate business end. Here discontent on the part of the Local's membership in all likelihood is attributable largely to the fact that the membership was locked out as the result of the Local's whipsaw stratagem. But the lockout itself is concededly within the rule of *Buffalo Linen*. We think that the added dissatisfaction, with its resultant pressure on membership, attributable to the fact that the nonstruck employers remain in business with temporary replacements is comparatively insubstantial. First, the replacements were expressly used for the duration of the labor dispute only; thus, the displaced employees could not have looked upon the replacements as threatening their jobs. At most the union would be forced to capitulate and return its members to work on terms which, while not as desirable as hoped for, were still better than under the old contract.

Second, the membership, through its control of union policy, could end the dispute and terminate the lockout at any time simply by agreeing to the employers' terms and returning to work on a regular basis. Third, in light of the union-shop provision that had been carried forward into the new contract from the old collective-bargaining agreement, it would appear that a union member would have nothing to gain, and much to lose, by quitting the union. Under all these circumstances, we cannot say that the employers' conduct had any great tendency to discourage union membership. Not only was the prospect of discouragement of membership comparatively remote, but the respondents' attempt to remain open for business with the help of temporary replacements was a measure reasonably adapted to the achievement of a legitimate end—preserving the integrity of the multi-employer bargaining unit.[4]

When the resulting harm to employee rights is thus comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful. Under these circumstances the finding of an unfair labor practice under § 8 (a)(3) requires a showing of improper subjective intent. Here, there is no assertion by either the union or the Board that the respondents were motivated by antiunion animus, nor is there any evidence that this was the case. On the contrary, the background of the employer association's relations with the union and all the circumstances of the respondents' behavior during the dispute tend to support the contrary conclusion: the history of labor relations between the employers and the Local divulges that the relationship has always been more than amicable;

---

[4] For a history of rejection by Congress of proposals to limit or outlaw multiemployer bargaining see *Buffalo Linen,* 353 U. S., at 95–96.

union-shop provisions have been incorporated in the collective-bargaining agreement between the Local and the employers for many years; in these very negotiations, the employers' association waived the failure of the Local to give timely notice of its desire to bargain over new terms of employment and consented to hear the Local's claims at the bargaining table; the record contains undisputed testimony by the store owners that they had no bone to pick with the Local, that on the contrary they thought that unions were a good thing, but felt forced to take action in order to preserve the multiemployer group from disintegration and to save their considerable stock of perishable food produce. Even the struck member of the association did not resort to permanent replacements for the striking workers, though it could have under *Mackay;* rather it sought to ride out the dispute with temporary replacements to avoid depriving the regular employees of their jobs. Thus, not only is there absent in the record any independent evidence of improper motive, but the record contains positive evidence of the employers' good faith. In sum, the Court of Appeals was required to conclude that there was not sufficient evidence gathered from the record as a whole to support the Board's finding that respondents' conduct violates § 8 (a)(3). See *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474.

It is argued, finally, that the Board's decision is within the area of its expert judgment and that, in setting it aside, the Court of Appeals exceeded the authorized scope of judicial review. This proposition rests upon our statement in *Buffalo Linen* that in reconciling the conflicting interests of labor and management the Board's determination is to be subjected to "limited judicial review." 353 U. S., at 96. When we used the phrase "limited judicial review" we did not mean that the balance struck by the Board is immune from judicial examination and reversal

in proper cases.[5]  Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10 (e), (f), 29 U. S. C. §§ 160 (e), (f) (1958 ed.).  Courts should be "slow to overturn an administrative decision," *Labor Board* v. *Babcock & Wilcox Co.*, 351 U. S. 105, 112, but they are not left "to 'sheer acceptance' of the Board's conclusions," *Republic Aviation Corp.* v. *Labor Board*, 324 U. S. 793, 803.  Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.  Such review is always properly within the judicial province, and courts would abdicate their

---

[5] This is evident from the authorities cited in *Buffalo Linen*, 353 U. S., at 96, n. 28.

In *Labor Board* v. *Babcock & Wilcox Co.*, 351 U. S. 105, we set aside, as resting on an erroneous legal foundation, a Board decision finding that the employer's refusal to allow distribution of union literature on a company-owned parking lot violated § 8 (a)(1).  In *Republic Aviation Corp.* v. *Labor Board*, 324 U. S. 793, we sustained the Board's decision but emphasized that judicial review is contemplated by 29 U. S. C. §§ 160 (e), (f), 324 U. S., at 799.  *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, involved a question of remedy as to which the statute expressly grants the Board broad authority, 29 U. S. C. § 160 (c).  Since *Buffalo Linen* numerous Board orders have been set aside as outside of the Board's statutory authority. See, *e. g., Labor Board* v. *Insurance Agents*, 361 U. S. 477; *Labor Board* v. *Drivers Local Union*, 362 U. S. 274; *Local 357, International Brotherhood of Teamsters* v. *Labor Board*, 365 U. S. 667; *Labor Board* v. *Fruit Packers*, 377 U. S. 58.  Even where the Board is sustained, its analysis in support of its conclusion is subjected to full, independent judicial review.  See *Labor Board* v. *Erie Resistor Corp.*, *supra*.

responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co.* v. *Labor Board, post,* at 318.

Courts must, of course, set aside Board decisions which rest on an "erroneous legal foundation." *Labor Board* v. *Babcock & Wilcox Co., supra,* at 112–113. Congress has not given the Board untrammelled authority to catalogue which economic devices shall be deemed freighted with indicia of unlawful intent. *Labor Board* v. *Insurance Agents, supra,* at 498. In determining here that the respondents' conduct carried its own badge of improper motive, the Board's decision, for the reasons stated, misapplied the criteria governing the application of §§ 8 (a) (1) and (3). Since the order therefore rested on an erroneous legal foundation, the Court of Appeals properly refused to enforce it.[6]                    *Affirmed.*

MR. JUSTICE GOLDBERG, whom THE CHIEF JUSTICE joins, concurring.

I agree with the Court that, given the *Buffalo Linen* case, *Labor Board* v. *Truck Drivers Union,* 353 U. S.

---

[6] We do not here decide whether the case would be the same had the struck employer exercised its prerogative to hire permanent replacements for the strikers under our rule in *Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333, and the nonstruck employers had then hired permanent replacements for their locked-out employees.

87, and applying it in light of the actualities of industrial relations, the employers' conduct here is shown to be justified and necessary to preserve the integrity of the employers' bargaining unit. After the union attempted a whipsaw strike against one member of the multiemployer bargaining unit, the other members locked out their employees. The struck employer attempted to carry on business by using management personnel, relatives of such personnel, and a few temporary employees. To avoid the whipsaw effect of the strike, the nonstruck employers then did the same. During the period of the lockout, all of the employers, struck as well as nonstruck, bargained with the union and, when agreement was reached, in all cases the temporary employees were dismissed and the union employees returned to their jobs.

As the Court seems to recognize, *ante,* p. 292, n. 6, this would be an entirely different case had the nonstruck employers locked out their employees and hired *permanent* replacements even if the struck employer had exercised his right to hire permanent replacements under the doctrine of *Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333. If the Labor Board determined in such a case that the interference with employee rights was not justified by the legitimate economic interests of the employer, the Labor Board determination might well be controlling. See my concurring opinion in *American Ship Building Co.* v. *Labor Board, post,* at 327. Cf. *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221. There would be grave doubts as to whether the act of locking out employees and hiring permanent replacements is justified by any legitimate interest of the nonstruck employers, for *Buffalo Linen* makes clear that the test in such a situation is not whether parity is achieved between struck and nonstruck employers, but, rather, whether the nonstruck employers' actions are necessary to counteract the whipsaw effects of the strike and to preserve the em-

ployer bargaining unit. Since in this case the nonstruck employers did nothing more than hire temporary replacements, an activity necessary to counter whipsawing by the union and to preserve the bargaining unit, I agree that, applying *Buffalo Linen,* the judgment of the Court of Appeals should be affirmed.

MR. JUSTICE WHITE, dissenting.

I cannot agree with the severe restrictions which the Court imposes on the Board's role in determining the employer conduct banned by §§ 8 (a)(1) and (3) of the NLRA. This Court has long recognized that "[a] statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application," *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194, and has repeatedly held that the Board may find some conduct sufficiently destructive of concerted activities and union membership as to fall within the broad language of §§ 8 (a)(1) and (3) notwithstanding that the employer has a business justification for his actions. *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793; *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87 *(Buffalo Linen)*; *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221; *Labor Board* v. *Burnup & Sims, Inc.,* 379 U. S. 21. The Board holds that a lockout together with the hiring of replacements by the nonstruck employers of a multiemployer bargaining unit violates §§ 8 (a)(1) and (3). The Court decides that this holding is an "unauthorized assumption by an agency of major policy decisions properly made by Congress," *ante,* at 292, and that the "proper balance to be struck between conflicting interests" requires affirmance of the denial of enforcement of the Board's order. This decision represents a departure from the many decisions of this Court holding that the Board has primary responsibility to

weigh the interest of employees in concerted activities against that of the employer in operating his business, *Phelps Dodge,* 313 U. S. 177; *Buffalo Linen,* 353 U. S. 87, 95; *Erie Resistor,* 373 U. S. 221; *Burnup & Sims,* 379 U. S. 21. The Board's discretion under these sections is not without substantial limits imposed by the policy of the Act and the requirement that the Board "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." *Phelps Dodge,* 313 U. S. 177, 197; cf. *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 168. But in my view the Board has set out the basis and requisite findings for its order in this case and has not exceeded its power in finding the lockout and replacement of union employees an unfair labor practice.

The Court reasons that *Buffalo Linen* gave the nonstruck employer in a multiemployer unit a "right" to lock out whenever a member of the unit is struck so that a parity of economic advantage or disadvantage between the struck and nonstruck employers can be maintained. In order to maintain parity where the struck employer hires replacements, the nonstruck employers must also be free to hire replacements, lest the right to lock out to protect the unit be illusory. And they need not offer these jobs to the locked-out employees desiring to work, lest the parity between the struck and nonstruck employers be lost and the right to lock out be meaningless. If this reasoning is sound, the nonstruck employers can not only lock out employees who belong to the union because of their union membership but also hire permanent as well as temporary nonunion replacements whenever the struck employer hires such replacements, for parity may well so require. But I cannot accept this reasoning.

One, *Buffalo Linen* established no unqualified "right" of employers in a multiemployer unit to lock out. Rather it held that the Board was well within the policy and

language of the Act in finding no unfair labor practice in the nonstruck members' ceasing operations after the union had successfully shut down the operations of one of the employers. Although a departure from the Board's general ban on lockouts because of their severe effect on protected employee rights, the Board found such a lockout justified by the union-imposed pressure on the employer unit where one employer could not operate and the others maintained full operations. The Board decided that the Act did not require the employers to contribute to this pressure by maintaining full operations.

Two, the threat to the integrity of the multiemployer unit, the consideration that was decisive in *Buffalo Linen*, is obviously very different where the struck employer continues operations with replacements; it certainly cannot be assumed that the struck employer operating with replacements is at the same disadvantage *vis-à-vis* the nonstruck employers as the employer in *Buffalo Linen* whose operations were totally shut down by the union. Indeed, there was no showing here that the struck employer was substantially disadvantaged at all, and the Board found that there was "no economic necessity . . . for the other members shutting down." 137 N. L. R. B. 73, at 77. The Court makes irrelevant the consideration that justified the lockout in *Buffalo Linen*—the effect of the single employer strike on the unit—on the faulty premise that *Buffalo Linen* established the nonstruck members' right to lock out. Neither the Board nor this Court said the right to lock out ineluctably follows from a single employer strike.

Three, the disparity between the struck employer who resumes operations and the nonstruck employers who choose to lock out to maintain a united front is caused by the unilateral action of one of the employer members of the unit and not by the union's whipsawing tactic. The integrity of the multiemployer unit may be important,

but surely that consideration cannot justify employer tandem action destructive of concerted activity.

Four, the Court asserts that the right of nonstruck employers to hire temporary replacements, and to refuse to hire union men, is but a concomitant of the right to lock out to preserve the multiemployer group. This sanctification of the multiemployer unit ignores the fundamental rule that an employer may not displace union members with nonunion members solely on account of union membership, the prototype of discrimination under § 8 (a)(3), *Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333, and may not maintain operations and refuse to retain or hire nonstriking union members, notwithstanding that most of the union members and most of the workers at that very plant are on strike. The struck employer need not continue operations, but if he does, he may not give a preference to employees not affiliated with the striking union, any more than he may do so after the strike, for § 7 explicitly and unequivocally protects the right of employees to engage and not to engage in a concerted activity and· § 8 (a)(3) clearly prohibits discrimination which discourages union membership. See *Firth Carpet Co.* v. *Labor Board,* 129 F. 2d 633 (C. A. 2d Cir.); *Labor Board* v. *Shenandoah-Dives Mining Co.,* 145 F. 2d 542 (C. A. 10th Cir.); *Labor Board* v. *Clausen,* 188 F. 2d 439 (C. A. 3d Cir.), cert. denied, 342 U. S. 868; *Labor Board* v. *Anchor Rome Mills,* 228 F. 2d 775, 780 (C. A. 5th Cir.); *Labor Board* v. *Robinson,* 251 F. 2d 639 (C. A. 6th Cir.). If dismissing and replacing nonstriking union members at a struck plant discourages union membership and interferes with concerted activities, I fail to understand how this same conduct at a nonstruck plant, even if in the name of multiemployer parity and unity, has a different effect on employee rights. The employees are not on strike, and desire to work, for whatever reasons, and nothing in the right to lock out can alter these facts.

The Court finds it unnecessary to explain how they are removed from the explicit protections of the Act, except to say they belong to the union or the unit the union represents and to assume conclusively they share its whipsawing purpose. Membership has never quite meant this before. The Court's justification for this invasion of employee rights by a member of a multiemployer unit is the employer's right to burden the union strike fund with all its members to bring economic pressure to bear on the union. Unfortunately, this reasoning has equal, if not greater, force in the single employer partial strike situation.

Finally, I cannot agree with the Court's fundamental premise on which its balance of rights is founded: that a lockout followed by the hiring of nonunion men to operate the plant has but a "slight" tendency to discourage union membership, which includes participation in union activities, *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, and to impinge on concerted activity generally. This proposition overturns the Board's long-held views on the effect of lockouts and dismissal of union members. Moreover, it is difficult to fathom the logic or industrial experience which on the one hand dictates that a guarantee to strike replacements that they will not be laid off after a strike is "inherently destructive of employee interests," although based on a legitimate and important business justification, *Erie Resistor,* 373 U. S. 221, and yet at the same time dictates that the dismissal of and refusal to hire nonstriking union members, who desire to work, because other union members working for a different employer have struck, have but a slight unimportant inhibiting effect on the affiliation with the union and on concerted activities. I think the Board's finding that this activity substantially burdens concerted activities and discourages union membership is far more consistent with *Erie Resistor* and industrial realities. Hence the Board

was well within its authority in opting for explicitly protected statutory rights of employees as against a limited employer privilege allowable only in exceptional circumstances under an unbroken line of Board decisions since the inception of the Act.

"Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide. Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining . . . . The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Buffalo Linen,* 353 U. S. 87, 96.

This is especially so where integrity of a multiemployer bargaining unit is the principal factor to be considered, since "the compelling conclusion is that Congress . . . 'intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.'" *Ibid.* I think the Court now repudiates this decision and assumes for itself the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner." *Erie Resistor,* 373 U. S. 221, 229. I would adhere to our prior cases and affirm the decision of the Board.