**PACKERLAND PACKING CO., INC.,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 73-1518.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1974.

Decided April 3, 1974.

Petition for review denied and order enforced.

Pell, Circuit Judge, filed a dissenting opinion.

James A. Gilker, Fort Smith, Ark., for petitioner.

Elliott Moore, Acting Asst. Gen. Counsel, William M. Bernstein, Atty., N. L. R. B., Washington, D. C., for respondent.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

### PER CURIAM.

The petitioner Company has sought review of, and the Board has applied for enforcement of, a Board order finding that the Company violated Sections 8(a)(3) and (1) of the Act by transferring employees Ted R. Rockwell, Charles Petty and Ronald Whiting because of their *union activity*. 203 NLRB No. 39.

The employees were city truckdrivers who joined the picket line during a June 1–2, 1971 strike by the certified representative of the Company's production and maintenance employees. The strike was settled and the employees returned to work as city truckdrivers on June 4. The Board found that "the matter of whether the city truckdrivers were in the . . . unit or not was never resolved, and [the union] . . . had not abandoned its claims over these employees." 203 NLRB No. 39, p. 5.

On June 5, the three employees were told that "they would be placed into the bargaining unit which now represents them."[1] Whiting and Petty were assigned to the boning room and Rockwell to the loading dock. On June 7 while performing one of the most exacting jobs in the Company's operation, Rockwell aggravated an old injury. On June 8, Whiting, who was required to stand all day in his new assignment, also aggravated an old injury.

In addition to cease and desist requirements, the Board ordered the three employees reinstated to their city truck-driving jobs and made whole for any loss of earnings suffered as a result of the discrimination.

Substantial evidence on the record as a whole supports the Board's finding and order.

Petition for review denied and order enforced.

PELL, Circuit Judge (dissenting).

I fail to find this case as free of complexities as apparently the majority opinion does, and therefore I respectfully dissent.

This appears to be a case in which the National Labor Relations Board has accepted the Administrative Law Judge's decision based upon credibility findings to the extent that the *decision conformed* to the Board's determination of the proper disposition of the case, but ignored those credibility findings when the converse was true and in effect substituted its own credibility findings for those of the Administrative Law Judge.

For some time prior to September 18, 1970, the Independent Packerland Employees Union (Independent) was the collective bargaining agent for all production and maintenance employees of Packerland, including, *inter alia*, truck-drivers. On September 18, 1970, the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (Amalgamated) was certified by the

---

1. At this time the Company's president, Frankenthal, read to the three employees from a letter written by their supervisor, which stated that these employees were unreliable because they had not worked on June 1 and 2 and that he did not want them driving for the Company in the future. The administrative law judge credited testimony that the letter was read to the employees.

Board, in a unit consisting of all production and maintenance employees of Packerland at its Green Bay, Wisconsin plant, excluding, *inter alia*, truckdrivers.

Packerland employed 16 truckdrivers in its rendering division, 18 or 20 over-the-road truckdrivers, and 3 city truckdrivers. The alleged discriminatees involved in the present case, Rockwell, Whiting, and Petty, were the 3 city truckdrivers.

A point of controversy between Packerland and Amalgamated was whether the 3 city truckdrivers were within the unit represented by Amalgamated. That point of dispute remained unresolved after the Administrative Law Judge's decision, after the Board's decision, and will still remain unresolved after this court's order of enforcement. It remains a festering source of labor disharmony, which apparently would have lent itself to resolution some time ago if the Administrative Law Judge's order, to which Packerland did not object, had been followed.

Apparently, contract negotiations between Amalgamated and Packerland were not successful because a strike ensued on the following June 1, which was resolved the next day by an agreement on the terms of the contract. This agreement, however did not in its terms resolve the bone of contention which is involved in the present case.

During the strike a picket line was established at the Packerland premises. Rockwell, Whiting, and Petty joined the picket line. Approximately 125 employee replacements were hired by Packerland during the short-lived strike. Whiting and Petty and the truckdrivers in the rendering division had appeared on the *Excelsior* list, and the voters' eligibility list for the election in which Amalgamated was chosen as the bargaining agent. Whiting and Petty had in fact voted in the election without challenge.

On June 2, representatives of Amalgamated and Packerland met in the offices of Federal Mediation and Conciliation Service in Green Bay. During that day there were private meetings between Packerland's President, Frankenthal, its attorney, and Amalgamated's chief spokesman, Wentz.

At one of these meetings Frankenthal said, "Ray, now are we all settled?" Wentz answered, "Yes, except for one thing. I want you to take back all the people who are now out. I have to get them off the concrete." Frankenthal replied, "Ray, there is a few people that I don't think are in your union that are out." Wentz said, "You take them back in my union." During these discussions Frankenthal also told Wentz that he "could not promise that each person would have their own kind of job that they had previous to the strike; but that we would put them to work—some kind of work . . . ." On the same day Frankenthal told Wentz and Mat Pinter, an Amalgamated representative, "I'll take these people back. How soon I just can't tell you, but I'll take them back, and they'll go in the unit." Thereafter a memorandum of understanding was reached whereunder the parties agreed that:

> "All employees who participated in the strike on June 1 and June 2, 1971, will be called back to the employment of the employer as the needs of the business require. It is understood and agreed that such call backs will be made as expeditiously as possible in seniority, as qualified, but nothing in the agreement between the parties shall require the employer to displace any current employees from employment to effect such call back. . . . However, the parties have agreed in good faith that a reasonable effort will be made to call back employees as soon as possible in accordance with the requirements of the business."

All strikers ultimately returned to work.

After the strike was terminated the three truckdrivers returned to the truckdriving jobs they had performed imme-

diately prior to the strike and worked as city truckdrivers on June 4 and 5.

On June 4, the plant superintendent was called by Frankenthal "to account for all the people who had been recalled." During this accounting, the names of Whiting, Rockwell, and Petty were mentioned. Apparently, acting upon the basis that the city truckdrivers were not in the production and maintenance unit represented by Amalgamated, at least as that unit was defined by Frankenthal, he commented that Packerland might be "at fault for calling them back into an area where they're not in the unit." He instructed the superintendent to proceed accordingly.

On June 5, Whiting, Petty, and Rockwell were called to the office of Frankenthal where, in the presence of the superintendent, Frankenthal told them they were "not in the trucking unit and they would be placed into the plant . . . into the bargaining unit which now represented them." The three were assigned to the areas within the plant, which assignment is the basis of the unfair labor practice charges resulting in the present proceedings before this court. At the time of this conference, Frankenthal read (although this was disputed) from a letter of a truck dispatcher that "due to the fact that [the alleged discriminatees] did not report to work on Tuesday and Wednesday of that week that [they] were no longer considered reliable and he [the truck dispatcher] did not want [them] driving for the company no more."

Subsequently, a complaint was issued in which it was alleged that Packerland had violated § 8(a)(1) and (3) of the Act by discriminatorily transferring Rockwell, Petty, and Whiting to more physically exhausting jobs because said employees respected a picket line at the Packerland premises and by constructively discharging Rockwell and Whiting because the work assigned to them aggravated pre-existing job-related injuries causing them to cease work. At the time the case came on for hearing, Packerland objected because Amalgamated and Independent were not made parties. Subsequently, they were made parties.

While the Administrative Law Judge did not credit either Frankenthal or Rockwell entirely, he did, as a matter of credibility, find the facts as they have been heretofore set out, with particular reference to the June 5 conference among the three men and Frankenthal.

Directing his attention to the alleged § 8(a)(3) violation, the Administrative Law Judge, on the basis that the real motive of the employer is decisive, NLRB v. Brown, 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), determined that Frankenthal's sole motive in transferring the three men was to fulfill "his understanding of the commitment to Wentz to return the employees who had ceased work during the strike to the Amalgamated unit" and therefore the transfers were not discriminatory. Frankenthal had done the same as to a driver from the rendering plant, who had observed the picket line, who was transferred into what Frankenthal conceived to be the unit, which, he contended, did not include truckdrivers. The Administrative Law Judge reached no conclusion as to whether Frankenthal was correct in his contract interpretation but merely that this was his motivation.

Accordingly, no violation was found in the transfer. The Administrative Law Judge, however, did find that Packerland violated § 8(a)(1) by the reading of the truck dispatcher's letter to the men as "[s]uch statement had a tendency to deter employees from honoring picket lines or picketing in the future, was coercive in character and interfered with employees' Section 7 rights."

The Administrative Law Judge, quite correctly in my opinion, also recommended that the matter of the transfers be put to arbitration, citing *Collyer Insulated Wire*, 192 NLRB No. 150. Both

Independent and Amalgamated had indicated that they would process grievances for the employees to arbitration.

The Administrative Law Judge then proposed an order, the crucial part of which is as follows:

"1. The Respondent Packerland Packing Company, Inc., its officers, agents, successors and assigns shall cease and desist from telling employees that due to the fact that they did not report to work during the occurrence of a strike they were no longer considered reliable and were not wanted by the dispatcher as truck-drivers."

It appears to me that in view of the settlement contract entered into by and between Packerland and Amalgamated, particularly with reference to the agreement that the employer not be required to displace any replacement employees, that the only matter here involved was that from which the Administrative Law Judge had ordered the company to cease and desist.

As I have indicated hereinbefore, if the matter had gone to arbitration, no doubt this troublous point in the industrial relations of the company would have long since been settled.

Instead, however, the Board rejected the arbitration recommendation and also found a § 8(a)(3) violation in the transfer. The Board disagreed with the Administrative Law Judge's finding, which credited Frankenthal's version of the negotiations. This appears to me to be contrary to the recognition to be given to the determination of credibility by the first line trier of fact, as set forth in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Board, in addition to ordering reinstatement with backpay, ordered Packerland to cease and desist from:

"(a) Discouraging membership in, or activity on behalf of, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local 248, or any other labor organization, by transferring employees or discriminating against them in any other manner in regard to their hire or tenure of employment or any term or condition of employment because they engaged in concerted and union activities.

(b) Telling employees that due to the fact that they did not report to work during the occurrence of a lawful strike they were no longer considered reliable and were not wanted as truck-drivers.

(c) In any other manner interfering with, restraining, or coercing employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act, or to refrain from any and all such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a)(3) of the Act."

As I have in effect indicated herein, in my opinion, the Board's order should not be enforced, but the order should be confined to that entered by the Administrative Law Judge.

Over and above the *Universal Camera* problem, it appears to me that the Board's order is far too broadsweeping to call for enforcement by this court.

Of course, if acts constituting an unfair labor practice are found, the Board is free to restrain the practice and other like or related unlawful acts. This, however, should not give the Board the authority to enjoin violations of all the duty provisions of the statute merely be-

cause one violation has been found. "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." NLRB v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

Here there is no evidence of persistent anti-union conduct and that part of the Board's order quoted above under (b) would reach and eliminate the only act which is shown in the record.

As it is, the Board has utilized the broadsweeping "In any other manner interfering with, restraining, or coercing employees in the exercise of their right to self-organization," etc., when only one act is involved with regard to three employees and even that, under any reasonable interpretation, being an ambiguous situation.

Packerland also complains that the Board's backpay award has not allowed deductions for the portion of the Workmen's Compensation payments which compensated the employees for physical damage, only that part compensating them for loss of earnings, citing American Manufacturing Co., 167 NLRB No. 71 (1967). The Board's answer to this contention is that the amount of backpay to the discriminatees, as well as appropriate deductions therefrom, are matters for consideration in subsequent backpay proceedings and not by this court at the present time. It is unfortunate if the only way that the company can test the propriety of a claimed deduction against a backpay award is to decline to pay the amounts determined and then litigate in contempt proceedings.

In any event, for the principal reasons, hereinbefore set out, I would limit the enforcement of the order to that ordered by the Administrative Law Judge.