**DEPARTMENT OF HEALTH AND HUMAN SERVICES, SOCIAL SECURITY ADMINISTRATION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**National Federation of Federal Employees, Intervenor for Respondent.**

**No. 85–1601.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1986.

Decided May 22, 1986.

Frederic Freilicher, Dept. of Justice (Richard K. Willard, Acting Asst. Atty. Gen., Civil Div., Robert B. Nicholson, Ellen Dickstein Kominers, Dept. of Health and Human Services, Washington, D.C., on brief), for petitioner.

William E. Persina, Associate Sol. (Ruth E. Peters, Sol., Steven H. Svartz, Deputy Solicitor, Susan Berk, Washington, D.C., on brief), for respondent.

(Patrick J. Riley, Deputy Gen. Counsel, Bruce P. Heppen, Nat. Federation of Federal Employees, Washington, D.C., on brief), for intervenor for respondent.

Before WINTER, Chief Judge, and SPROUSE and CHAPMAN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

The Department of Health and Human Services, Social Security Administration (SSA), seeks review, under 5 U.S.C. § 7123(a), of the decision and order of the Federal Labor Relations Authority (Authority) in National Federation of Federal Employees, Council of Consolidated SSA Locals and Department of Health and Human Services, Social Security Administration, 17 F.L.R.A. No. 95 (April 23, 1985). In that proceeding, the Authority ordered SSA to bargain over a union proposal that would preclude SSA from charging its employees with errors attributable to recent changes in, and clarifications to, the SSA operations manual during the first six months those changes and clarifications became effective. The union, National Federation of Federal Employees (union), has intervened in the proceeding.

Because we conclude that the union's proposal would violate SSA's right to direct and assign work under the pertinent provision of the Federal Service Labor-Management Relations Statute, as amended (the Act), 5 U.S.C. §§ 7101–7135 (1982 & Supp. II 1984), we reverse.

## I.

This case arose when SSA made substantial revisions in its manual used by SSA's claims representatives and data review technicians to process applications for Supplemental Security Income. The revisions required the employees to change some of the procedures theretofore followed, and it could be expected that complete accuracy on the part of the employees in conforming to the changes would not be immediately forthcoming. The union therefore proposed a six-month moratorium on evaluating employee errors in applying the changed procedures. During the moratorium, employees' errors would be noted and corrected, but no claims representative or data review technician would be charged with any error with regard to payment of benefits or documentation of any claim.[1]

The union, in exercise of its rights under 5 U.S.C. § 7114, requested SSA to negotiate over its proposal.[2] SSA refused, asserting its management rights secured in § 7106(a)(2), which relieves an agency from the duty to negotiate over proposals that interfere with an agency's prerogative to direct and assign work.[3] The union appealed to the Authority which is given the duty by 5 U.S.C. § 7117(c)(1) to review the negotiability of union proposals to federal agencies.

Before the Authority, SSA argued that the proposal violated its right to direct and assign work because adoption would prevent it from assessing errors against individual employees and thus deprive it of its right to evaluate and assign them work according to their talents. The union contended that the proposal was within SSA's duty to bargain because it involved a procedure by which employees' work would be judged, and did not prevent SSA from acting at all in regard to its right to direct employees and assign work.[4]

---

1. The text of the union's proposal is as follows: April 1, 1983, 9 policy changes and 90 clarifications were issued on the issue of In-Kind Support and Maintenance in the SSI Program. The Union proposes that a moratorium of 6 months duration be granted beginning April 1, 1983. During this period, errors will be noted and corrected. However, no claims representative nor data review technician will be charged with payment or documentation errors on issues relating to these 9 policy changes or 90 clarifications. If any are charged, they will be removed.

2. The union also requested bargaining over two other proposals with which we are not concerned in this petition for review. The Authority held that neither was negotiable.

3. The pertinent language of § 7106(a)(2)(A) & (B) is:
   (a) [N]othing in this chapter shall affect the authority of any management official of any agency—

   (2) in accordance with applicable laws—
   (A) to hire, assign, direct, layoff, and retain employees in the agency....
   (B) to assign work ... and to determine the personnel by which agency operations shall be conducted ...

4. The union's argument in its own words was:
   Employees are directly affected by the errors that they are charged with. This is reflected

The Authority sustained the union's position. It viewed the six-month moratorium as "tantamount to a training period during which employees are to familiarize themselves with substantial revisions to their published guidance before they are charged with errors attributable to not following the new procedures." It likened the instant proposal to one which had been considered in American Federation of State, County and Municipal Employees, Local 2910, AFL–CIO and Library of Congress, 15 F.L.R.A. No. 112 (1984), which delayed the application of performance requirements during the first three months that an employee is performing the duties of a new position. In *Library of Congress*, the Authority had reasoned that because the proposal only precluded employees from being evaluated during their training period, but did not excuse them from their duty to perform the work assigned, the proposal did not interfere with management's right to assign work. It therefore concluded that SSA had a duty to bargain.

## II.

We recognize that the scope of our review of the Authority's decision "is limited to whether the agency's [action] is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *United States Army Engineer Center v. FLRA*, 762 F.2d 409, 414 (4 Cir.1985). *See* 5 U.S.C. §§ 706, 7123(c). At the same time, we have been admonished not to "rubber stamp ... administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78

L.Ed.2d 195 (1983), (*quoting NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

We think that the union's proposal and the Authority's conclusion are inconsistent with and do frustrate the congressional directive that SSA shall retain the right to direct employees, to assign their work, and to determine the personnel by which SSA's operations shall be conducted. *See* 5 U.S.C. § 7106(a)(2)(A) & (B). The Authority and the union do not question that it is a non-negotiable management prerogative to set performance standards by which an employee's work is evaluated. *See, e.g., American Federation of Government Employees v. FLRA*, 691 F.2d 565, 570 (D.C.Cir.1982) ("formulation of performance standards ... fall[s] outside the duty to bargain"). We think that a performance standard is not limited to how well an employee performs after a set period, such as six months, but may include how quickly an employee masters new material. In holding otherwise, the Authority wrongly assumed that timing was unimportant to the performance standard as if SSA management were indifferent to how much time an employee requires to learn new material. To the contrary, SSA has a great interest in knowing which employees can be counted on for quickly comprehending the ongoing changes and clarifications in the SSA operations manual.

We do not view the proposed moratorium as a mere postponement of an evaluation system of new employees undergoing on-the-job training as was considered in *Library of Congress*. Here we deal with existing employees and the extent to which having learned to perform satisfactorily a given set of instructions, they have the

on their appraisals. We are not questioning managements' right to set standards for employees. Charging employees with errors has an adverse effect on those employees. We feel the methods used in this procedure must be fair and equitable. Our proposals allow for this. Management under all three proposals would be able to give the employees direction, we are not asking them to change their directions or stop the directions, just asking them to negotiate how these directions

will affect employees. Furthermore, we are not saying that they cannot assign employees the work, again we are only asking that they negotiate with us the procedures by which they judge our work and the length of time it takes to do this work. Since the measurement of timeliness and the assessment and classification of errors is arbitrary we believe it can have an adverse affect on employees. Therefore, we believe that our proposals are negotiable.

flexibility, the ability and the motivation to respond promptly and accurately to new directions. We think that it is a part of the rights of management to know which of its employees can readily and accurately adjust to change so that when future changes are contemplated, it has a basis on which to assign existing employees to new tasks with minimum administrative disruption, and perhaps also, to conclude that employees who cannot achieve an average adjustment to change should not be retained.

We view this case as falling within the ambit of *Internal Revenue Service and Brookhaven Service Center and National Treasury Employees Union and NTEU, Chapter 99*, 14 F.L.R.A. 766 (1984), rather than *Library of Congress*. In *IRS*, the service set quantity and error rates for its seasonal data transcribers at 80%, 90% and 100% of the average for the first, second, and third weeks of employment, respectively. A transcriber risked not being retained if he failed to reach these levels. A union proposal to extend this schedule of expectations over a period of twenty-four rather than three weeks was ruled to be nonnegotiable because it conflicted with management's right to direct employees and assign work.

Significantly, *IRS* could be deemed to be only a "postponement" case as the union and the Authority contend is the case before us. But there the Authority ruled that it was not, and we do not think that our case is any different. SSA has an equal right to expect a certain degree of efficiency in mastering and applying new procedures and it therefore has a right to evaluate employees' achievement beginning immediately after new guidelines go into effect. The union proposal here effectively lowers the performance expectation for applying the new guidelines to 0% accuracy during the first six months, and thus goes even beyond *IRS* in restricting management's prerogative to set performance standards.

The union also advances two alternate grounds for upholding the negotiability of its proposal. The union contends that the proposal is negotiable as a procedure for exercising management authority under 5 U.S.C. § 7106(b)(2), or as an appropriate arrangement for adversely affected employees under § 7106(b)(3). For reasons explained more fully above, we think that a proposal prohibiting SSA from measuring an employee's speed and accuracy in mastering new material is a substantive, not merely procedural limitation on management authority. We also reject the implicit claim that employees are "adversely affected" by changes and clarifications in the SSA operations manual, or by an evaluation of their ability to learn the new material. We think § 7106(b)(3) permits the union to propose appropriate arrangements for terminated or demoted employees, for example, not for employees whose job becomes more demanding because its requirements change. *See, e.g., American Federation of Government Employees, AFL-CIO, Local 2782 v. FLRA*, 702 F.2d 1183 (D.C.Cir.1983) (involving employee demotions).

We therefore reverse the Authority's decision and order and hold that SSA has no statutory duty to negotiate or bargain with the union over this proposal.

REVERSED.

SPROUSE, Circuit Judge:

I respectfully dissent.

Given the facts underlying the Federal Labor Relations Authority's action, I do not find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982); *see United States Army Engineer Center v. FLRA*, 762 F.2d 409, 414 (4th Cir.1985).

Early in 1983, the Social Security Administration (SSA) substantially revised the manual which its field office personnel use to process Supplemental Security Income applications.[1] The revisions consisted of

---

**1.** Supplemental Security Income is a federal cash assistance program providing income to indigent individuals who are blind, disabled or over 65 years of age.

nine policy changes and approximately ninety clarifications in the manual section dealing with "in-kind support and maintenance." The National Federation of Federal Employees, the union representing SSA personnel, requested that the agency bargain with it on a proposal to place a six-month moratorium on charging SSA personnel with errors in implementing the manual revisions. The proposal would not have delayed implementation of the revisions nor limited SSA's ability to note and correct mistakes by SSA personnel. Rather, as the FLRA ruled, the proposal provided the employees with a period in which "to familiarize themselves with substantial revisions ... before they are charged with errors attributable to not following the new procedures."

The majority correctly notes the limitations on judicial review of FLRA actions and the Supreme Court's admonition that judicial deference does not mean "rubber stamp[ing] administrative decisions that [courts] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco and Firearms (BATF) v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (*quoting NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). I think the proper application of these principles requires our deference to the FLRA's decision. Congress granted to the FLRA broad authority to resolve disputes between the federal government and its employees. *Id.* As a result, the FLRA is able to draw upon its extensive experience in dealing with complicated management-employee disputes and in applying the body of precedential law resulting from prior exercise of its authority.

Whether the union proposal here interferes with a substantive management right, and thus is non-negotiable, or whether it relates only to a negotiable procedure observed in exercising a management right is a close question. To me, the rationale which we should apply to resolve the issue is not distinguishable from that utilized to resolve the similar issue presented in

*American Federation of State, County, and Municipal Employees, Local 2910, AFL–CIO and Library of Congress*, 15 FLRA No. 112 (1984). As in *Library of Congress*, the FLRA here determined that the union proposal would not interfere with a non-negotiable management prerogative. The agency retains its discretion to determine what work shall be done, in what manner and by which employees. It would continue to evaluate employees on their performance but not on performance related to the revisions during a six-month period. While the FLRA decision here may or may not be the construction I would reach in a *de novo* setting, it is not an unreasonable one. *See United States Army Engineer Center*, 762 F.2d at 414. For that reason, and because I believe the FLRA decision is not inconsistent with congressional intent in setting forth management rights in 5 U.S.C. § 7106 (1982 & Supp. II 1984), I would enforce the FLRA's order.