INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS et al., Plaintiffs,

Brotherhood of Railway and Airline Clerks, Intervenor-Plaintiff,

v.

NATIONAL RAILWAY LABOR CONFERENCE et al., Defendants.

ALTON & SOUTHERN RAILWAY COMPANY et al., Plaintiffs,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS et al., Defendants.

CONGRESS OF RAILWAY UNIONS et al., Plaintiffs,

v.

NATIONAL RAILWAY LABOR CONFERENCE et al., Defendants.

Civ. A. Nos. 298–70, 299–70, 358–70.

United States District Court, District of Columbia.

March 2, 1970.

Edward J. Hickey, Jr., Washington, D. C., for Intern. Ass'n of Machinists & Aerospace Workers, and others.

James L. Highsaw, Jr., Washington, D. C., for Broth. of Ry. & Air Line Clerks.

Lester P. Schoene, Washington, D. C., for Congress of Ry. Unions, and others.

Francis M. Shea, and Richard T. Conway, Washington, D. C., for carriers.

## OPINION

CORCORAN, District Judge.

### I.

These three actions, consolidated for purposes of oral argument, arise out of a labor dispute between the nation's Class I railroad carriers and four shopcraft unions, *viz.* International Association of Machinists and Aerospace Workers, Sheet Metal Workers International Association, International Brotherhood of Electrical Workers, and International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (hereinafter collectively referred to as the shopcraft unions).

In Civil Action No. 298–70 the shopcraft unions seek a preliminary injunction against a nationwide lockout threatened by the railroads in the event the shopcraft unions strike individual carrier. The Brotherhood of Railway and Airline Clerks (BRAC) has intervened on the side of the shopcraft unions.

In Civil Action 299–70 the railroads seek a preliminary injunction against any strike by the shopcraft unions against any individual carrier.

In Civil Action No. 358–70, the Congress of Railway Unions (CRU) and its five member unions, representing over 400,000 employees, seek a preliminary injunction against a lockout by the railroads.

### II.

At the outset it is necessary to place the case in its historical context.

There are 128 Class I railroads operating in the United States. The total unionized work force exceeds 500,000 employees. The four shopcraft unions represent approximately 45,000 workers, and the Sheet Metal Workers International Association, whose activities precipitated this dispute, has approximately 6,000 members.

On November 8, 1968 each of the shopcraft unions, pursuant to Section 6 of the Railway Labor Act (45 U.S.C. § 156), served upon each of the 128 Class I railroads identical notices proposing changes in general wage rates and other wage adjustments for those employees represented by the unions. The notices stated *inter alia* that if the representatives of the individual carrier on which the notice was served and the representatives of the labor organization involved were unable to reach agreement on the proposals, then the shopcraft unions proposed that the matters be handled on a joint national basis. The notices also stated that the four shopcraft unions had formed an Employees' Conference Committee and requested, if individual agreements could not be reached, that each carrier join and form a Carriers' Conference Committee which would ne-

gotiate on a national level in accordance with the Railway Labor Act.[1]

On November 26, 1968 each of the carriers served on the union organizations identical counterproposals which proposed substantial changes in various work rules to be handled concurrently with the unions' proposals.

Initial conferences with each carrier on an individual basis failed to produce agreement. So, in accordance with the shopcraft unions' request included in their Section 6 notices, national bargaining began on March 17, 1969 between the Employees' Conference Committee and the National Railway Labor Conference (which was assisted by regional Carriers' Conference Committees).

As these negotiations also failed to produce agreement, the parties jointly, on April 10, 1969, applied for the services of the National Mediation Board pursuant to Section 5 First of the Railway Labor Act (45 U.S.C. § 155 First). Mediation likewise failed to produce an agreement.

On August 19, 1969 the Mediation Board, pursuant to Sections 7 and 8 of the Railway Labor Act (45 U.S.C. §§ 157, 158), requested the parties to submit the dispute to voluntary arbitration. The carriers accepted the proffer of arbitration but the shopcraft unions declined; and on September 3, 1969 the Mediation Board relinquished jurisdiction of the dispute.

The shopcraft unions then served notice of their intention to strike seven of the Class I railroads involved in the dispute. The carriers countered by announcing that if any individual railroad were struck, the carriers would shut down all operations and lock out all employees.

The next step was a notification by the National Mediation Board to the President of the United States, pursuant to Section 10 of the Railway Labor Act (45 U.S.C. § 160). The Board reported that in its judgment the strike by the shopcraft unions threatened to interrupt interstate commerce to such a degree as to deprive a section of the country of essential transportation services. The President then, on October 3, 1969, created Emergency Board No. 176 to investigate promptly the facts of the dispute and report to him within 30 days.

The Emergency Board made recommendations which the shopcraft unions refused to accept. The Board reported its failure to resolve the dispute to the President on November 2, 1969. The procedures of the Railway Labor Act for solving major disputes were accordingly exhausted.

The shopcraft unions and the carriers nevertheless continued national bargaining under the auspices of the Secretary of Labor; and finally on December 4, 1969 the parties' representatives initialed a "Memorandum of Understanding" setting forth the terms of the agreement, subject only to ratification by the members of each of the shopcraft unions. The Machinists and Aerospace Workers, the Electrical Workers, and the Brotherhood of Boilermakers all ratified. The Sheet Metal Workers, however, balked at accepting a work rule permitting members of one shopcraft union to perform incidental work in another craft and refused to ratify. The agreement

1. In pertinent part the notices read:
"In the event that we are unable to reach an agreement upon the foregoing request at such joint conferences, we further propose that the matter be handled on a joint national basis.
"On the assumption that an agreement may not be reached in our joint conference, the organizations serving this identical Notice on the various carrier managements have created an Employees' Conference Committee composed of the International Officers or their representatives, of the organizations serving this identical Notice.
"In the event an agreement is not reached with this carrier, we request that you join with other carrier managements who are receiving identical Notices, in the creation of a Carriers' National Conference Committee, to negotiate in accordance with the procedures of the Railway Labor Act, as amended, the subject matter of this notice."

accordingly failed, since the unions had agreed among themselves that none would accept unless all accepted.[2]

At 12:01 a. m. on January 31, 1970 the shopcraft unions struck the Union Pacific Railroad. The carriers thereupon announced a nationwide cessation of operations to commence at 10:00 p. m. January 31, 1970. Both sides sought temporary restraining orders—the unions against a lockout, the carriers against the strike—and at 4:00 p. m. January 31, 1970, 310 F.Supp. 904 the Court (Sirica, J.) granted both requested temporary restraining orders, thus freezing the situation.

Negotiations continued and, to provide necessary time to reach agreement, the temporary restraining orders were extended by consent of both parties until February 20, 1970. On that date this Court heard oral argument on motions for preliminary injunctions and continued the temporary restraining orders until Midnight March 2, 1970 or the earlier issuance of this opinion and order.

### III.

All the petitions are concerned with the resolution of these issues, *viz.*

(1) Whether the shopcraft unions, having engaged in national handling of the dispute and upon failure of the national handling to produce an agreement, may strike an individual carrier; and, if so,

(2) Whether the carriers under the circumstances may retaliate by way of a nationwide lockout.

The several positions may be summarized as follows:

(1) *The shopcraft unions contend:*

(a) that they have the right to strike any one of the carriers and are not required to strike all 128 railroads. They allege that in striking a single carrier their purpose is to avoid a nationwide rail crisis. This tactic, they claim, preserves the principle of collective bargaining while protecting the public interest.

(b) that a nationwide lockout by the railroads would be a clear violation of Section 1(4) and 1(11) of the Interstate Commerce Act (49 U.S.C. § 1(4), (11)) and Section 2 First of the Railway Labor Act (45 U.S.C. § 152 First). Such a lockout, they allege, would be in total disregard of the public interest. They charge that the carriers would use the lockout to force a nationwide transportation crisis, thus creating a reason for Congress to step in and compel arbitration.[3] They cite to Brotherhood of Railway & Steamship Clerks v. Florida E. C. R. Co., 384 U.S. 238, 244–245, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966) where the Court said that the carrier "owes the public reasonable efforts to maintain the public service at all times" even after self help has become available to the parties.[4]

---

2. The Court is informed that at the last negotiating session on the evening before oral argument the three ratifying unions offered to accept the "Memorandum of Understanding" despite the Sheet Metal Workers' refusal to ratify. Supplemental Affidavit of William W. Winpisinger, filed February 26, 1970.

3. Twice in the past decade Congress has acted to prevent a nationwide rail crisis. Public Law 88–108, 77 Stat. 132, enacted August 28, 1963, called for binding arbitration and established Arbitration Board 282 with the power to create a new set of work rules to govern the use of firemen on all railroads. For a discussion of

the workings of this Award see Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., 128 U.S.App.D.C. 59, 68–70, 385 F.2d 581, 590–592 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 856, 19 L.Ed.2d 983 (1968). Public Law 90–54, 81 Stat. 1225, enacted July 17, 1967, established a Special Board with the power to make a binding determination of a major wage dispute between the shopcraft union and carriers. Such determination lasted two years and had the same effect as if arrived at by agreement of the parties pursuant to the Railway Labor Act.

4. The Court did not hold the carrier's duty to be "absolute" but only held that a rea-

(2) *The intervenor, BRAC,* agrees with the contentions of the shopcraft unions but further contends that the Court has jurisdiction to enjoin a lockout notwithstanding the provisions of the Clayton Act (29 U.S.C. § 52) and the Norris-LaGuardia Act (29 U.S.C. § 101 et seq.).

(3) *The Congress of Railway Unions* contends that it has no dispute with the carriers but that a lockout would throw its employees out of work in violation of previous agreements between the carriers and the unions, thus violating Section 2 First and Seventh of the Railway Labor Act (45 U.S.C. § 152 First and Seventh).

(4) *The carriers contend:*

(a) that the shopcraft unions, having agreed to national handling of the dispute and having bargained on a national basis, cannot now resort to the "whipsaw strike" tactic[5] because it will destroy the multi-employer bargaining unit and compel the negotiation of separate agreements by individual carriers. Such action they contend violates Section 2 First, 2 Second, 2 Third of the Railway Labor Act (45 U.S.C. § 152 First, Second, Third).

(b) that the shopcraft unions' insistence on membership ratification is unlawful—that either the "Memorandum of Understanding" constitutes a binding agreement or the union's handling of the dispute has not satisfied the good faith bargaining requirements of Section 2 First of the Railway Labor Act.

(c) that the shopcraft unions have not exerted every "reasonable effort" to settle a "skill adjustment" demand and so have not satisfied the requirements of Section 2 First of the Railway Labor Act, and

(d) that the proposed nationwide lockout is both a necessary and a legal response to the whipsaw tactics of the union.

(i) It is said to be necessary to preserve the multi-employer bargaining unit since otherwise the economic pressure exerted by the labor force as a whole, if brought to bear against an individual carrier, would bring that carrier—and each one similarly struck—to its knees. Only by being able to resort to concerted action, the carriers claim, and to match their total economic force against the economic force of the labor unions can effective resistance be generated. This argument expresses the reality of labor-management relations that although an individual carrier might be struck by only a small segment of the entire labor force, that entire labor force will refuse to cross picket lines thereby employing the total economic pressure available to the labor unions.

(ii) It is said to be legal in that it is implicit in the Supreme Court decisions that a party can resort to necessary self help once the procedures of the Railway Labor Act have been exhausted. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 379, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); Detroit and Toledo Shore Line R. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., 372 U.S. 284, 291, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963). It is also said to be legal in that it is sanctioned by

---

sonable effort to maintain service must be made. The question raised in this suit—a nationwide lockout in retaliation to a whipsaw strike—was not reached by the Court.

5. A "whipsaw strike", by common understanding, is a strike against only one

member of a multi-employer bargaining unit in an attempt by the use of economic pressure to force that member and each subsequent member to come to an agreement separately. National Labor Relations Board v. Truck Drivers Local Union No. 449, 353 U.S. 87, 90 fn. 7, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

analogous decisions under the National Labor Relations Act (29 U.S. C. § 151 et seq.) which explicitly hold that the non-struck members of a multi-employer bargaining unit can resort to a lockout which is only a "defensive measure to preserve the multi-employer group in the face of the whipsaw strike." National Labor Relations Board v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); National Labor Relations Board v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S. Ct. 643, 1 L.Ed.2d 676 (1957).

(d) that Section ˙20 of the Clayton Act (20 U.S.C. § 52) and Section 8 of the Norris-LaGuardia Act (29 U.S. C. § 108) validate a lockout in a labor dispute and deprive courts of jurisdiction to enjoin such a lockout.

## IV.

■ As noted, the disputants have each requested a preliminary injunction. For such extraordinary relief to issue the petitioner must show that it has a substantial likelihood of success on the merits and that irreparable harm will result from a denial of the injunction. The Court must also consider whether substantial harm will flow to the opposing party if the injunction issues and must as well weigh the public interest. Quaker Action Group v. Hickel, 1111 F.2d 421 (D.C.Cir., June 24, 1969); Virginia Petroleum Jobbers Ass'n. v. F.P.C., 104 U.S.App.D.C. 106, 259 F.2d 921 (1968.)

With those standards in mind and having studied the briefs and affidavits, the Court concludes that the shopcraft unions' whipsaw strike against the Union Pacific Railroad violates the Railway Labor Act and that such violation is subject to an injunction issuing from this Court.

## V.

It is conceded by both sides that once the bargaining and mediation procedures of the Railway Labor Act have been ex-hausted the parties may resort to self help.

"Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration'." Railroad Trainmen v. Terminal Co., supra, 394 U.S. at 379, 89 S.Ct. at 1115.

" * * * [B]oth parties, having exhausted all of the statutory procedures, are relegated to self-help in adjusting this dispute * * *." Locomotive Engineers v. Baltimore & Ohio R. Co., supra, 372 U.S. at 291, 83 S.Ct. at 695; Railway Clerks v. Florida E. C. R. Co., supra, 384 U.S. at 244, 86 S.Ct. at 1423.

But, whereas the ultimate weapon to be used by a union in the normal situation is a strike, the issue in this case is whether, after national handling of a dispute has failed to produce an agreement, a strike against an individual carrier who has been part of the multi-employer bargaining unit is legal.

Concededly there is no express language in the Railway Labor Act that compels national handling. However, the Court of Appeals in Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. Co., 127 U.S.App.D.C. 298, 302, 383 F.2d 225, 229, (1967) has held that national handling is legal and may under some circumstances be obligatory.

"Whether it is obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements."

Accordingly we look here to the "practical appropriateness of mass bargaining" and the "historical experience in handling any similar national movements."

In the railroad industry, national handling or multi-employer bargaining with the shopcraft unions has a long history reaching back to World War I. Those unions in past years have agreed that

national handling was the best means of achieving meaningful bargaining; and every national movement, whether for wages or rules changes, has been handled and disposed of on a national basis.[6] Changes in wage agreements for the shopcrafts were made on a national level following multi-carrier national bargaining in 1937, 1941, 1944, 1946, 1947, 1949, 1951, 1953, 1954, 1955, 1956, 1960, 1962, 1964, 1965, and 1966. There is thus a history and a pattern of national handling in the industry. And in the present dispute negotiations have been proceeding on a national multi-employer, multi-union basis, since March 1969.

The practicality of handling wage disputes between the shopcraft unions and the carriers on a national level is readily apparent. Obviously if wage adjustments were to be handled on an individual carrier basis, each carrier would be deterred from settling because of the possibility that a competing carrier might obtain better terms; and, by the same token, union members would be dissatisfied if employees on other railroads doing the same job received higher salaries. The unions have themselves recognized the appropriateness of multi-employee bargaining as indicated by their Section 6 notices which gave rise to the national handling.

■ Under the circumstances it would appear to this Court that both the "practical appropriateness" of mass bargaining and "historical experience" in handling the issue in the past make continued national handling obligatory. Chicago, Burlington & Quincy R. R. v. Railway Employees Dept., 301 F.Supp. 603, 607 (D.D.C.1969). National handling being obligatory, this Court would hold that any action taken to defeat continued national handling violates the provisions of the Railway Labor Act.

Section 2 First of the Railway Labor Act reads:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

Section 2 Second reads in part:

"[A]ll disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided * * * in conference between representatives designated * * * by the carrier or carriers and by the employees thereof interested in the dispute."

The duty laid out in Section 2 First is "the heart of the Railway Labor Act." Railroad Trainmen v. Terminal Co., *supra*, 394 U.S. at 377–378, 89 S.Ct. at 1115. By initiating and negotiating the dispute on an obligatory national basis and then striking the carriers on an individual basis it seems clear that the unions have violated their duty to "exert every reasonable effort to make * * * agreements * * * and settle disputes." Having begun on a national level, it is incumbent upon the parties to continue to deal on a national level even after the procedures of the Railway Labor Act have been exhausted. To act otherwise would take on the character of bad faith bargaining.

"What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past." Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. Co., *supra*, 383 F.2d at 229. Considering the history of national handling of this and past disputes and the present pattern of negotiations, the shopcraft unions' action in striking an individual carrier

---

6. Brief for the Seventeen Cooperating Labor Organizations before Emergency Board No. 98 at 79 (1952).

exhibits bad faith which also violates Section 2 First.[7]

■ The Court interprets Section 2 Second as well to mean that once negotiations have begun on an obligatory national basis the negotiations must continue until the dispute is settled on that basis. To hold otherwise would work an unreasonable burden on the carriers and the entire concept of collective bargaining.

■ The Court's decision that the unions' whipsaw strike is illegal finds support in decisions under the National Labor Relations Act (and the amendatory Labor Management Relations Act). Although "the National Labor Relations Act cannot be imparted wholesale into the railway labor arena", the Supreme Court has in the past referred to it "for assistance in construing the Railway Labor Act" as "the only existing congressional expression as to the permissible bounds of economic combat." Railroad Trainmen v. Terminal Co., *supra*, 394 U.S. at 383, 89 S.Ct. at 1118.

■ The decisions under Sections 8(b) (3) and (d) of the National Labor Relations Act (29 U.S.C. § 158(b) (3) and (d)), which are similar to Sections 2 First and Second of the Railway Labor Act,[8] hold that a union violates the National Labor Relations Act when it begins bargaining on a multi-employer level and then attempts to force individual agreements by whipsaw striking individual members of the multi-employer unit. Int'l. Union of Operating Engineers, Local 825, 145 NLRB 952 (1964).

■ Having concluded under the circumstances that the strike against the Union Pacific violates the provisions of the Railway Labor Act, the Court does not feel constrained by Section 4 of the Norris-LaGuardia Act (29 U.S.C. § 104), which, on its face, would seem to prohibit injunctive relief in labor disputes except under prescribed conditions.

"[T]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act." Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1956). In general the denial of the Court's jurisdiction to grant injunctive relief under Section 4 of Norris-LaGuardia is lifted when a disputant violates some provision of the Railway Labor Act.

"We are clear that the District Court was correct in holding that it had jurisdiction to enjoin a violation of the Railway Labor Act, and that this jurisdiction was not negatived by or subject to Section 4 of the Norris-LaGuardia Act." Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., 128 U.S.App.D.C. 59, 91, 385 F.2d 581, 613 (1967), cert. denied, Brotherhood of Locomotive Firemen v. Bongar and Aroostock R. Co., 390 U.S. 923, 88 S.Ct. 851, 856, 19 L.Ed.2d 983 (1968).

■ The Court then looks to the appropriateness of issuing an injunction in the light of Section 8 [9] of the Norris-LaGuardia Act. Section 8 of Norris-LaGuardia and the provisions of the Railway Labor Act must be reconciled and accommodated to protect the public interest in avoiding interruption of commerce Piedmont Aviation, Inc. v. Air Line Pi-

7. "The requirement of good faith bargaining is really a requirement of absence of bad faith." American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 794 (S.D.N.Y.1958).

8. "The negotiation required by the Act is the same 'good faith' bargaining required by the Labor Management Relations Act." Norfolk & P. B. L. R. Co. v. Brotherhood of Railroad Trainmen, 248 F.2d 34, 45, fn. 6 (4th Cir. 1957).

9. Section 8 of the Norris-LaGuardia Act provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

lots Association, International, 4 Cir., 416 F.2d 633, 638 (1969). Section 8 is not an absolute bar against an injunction but is read merely as requiring a condition or limitation on the petitioner's right to an injunction. Where the petitioner has violated any of the sections of the Railway Labor Act, the "clean hands" doctrine of Section 8 applies and the Court cannot issue an injunction. Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., *supra*, 28 U.S.App. D.C. at 92, 385 F.2d at 614. Here we find no violation of the Railway Labor Act on the part of the carriers.

■ The Court does not consider the threat of a lockout, in the circumstances of this case, to constitute a violation of the Railway Labor Act. National Labor Relations Board v. Brown, *supra*, 380 U.S. at 278, 85 S.Ct. 980; National Labor Relations Board v. Truck Drivers Union, *supra*, 353 U.S. at 87, 77 S.Ct. 643. An injunction against the whipsaw strike may accordingly issue.

■ Since the threat of the lockout is professedly and admittedly a defensive, retaliatory measure which will not materialize once the whipsaw strike is thwarted, the prayers for an injunction against a lockout are mooted. Nor is it necessary to consider the contentions made by the carriers as to the illegality of the union ratification procedures or as to whether the union exerted reasonable efforts to settle the "skill adjustment" demand.

### VI.

The Court grants the preliminary injunction sought by the carriers in C.A. 299–70.

The Court denies the preliminary injunction sought by the shopcraft unions in C.A. 298–70, and denies the preliminary injunction sought by the Congress of Railway Unions in C.A. 358–70.

The foregoing constitutes the Court's findings of fact and conclusions of law.