690 F.Supp. 802 (1988)
AMERICAN RAILWAY AND AIRWAY SUPERVISORS ASSOCIATION (DIVISION OF BRAC); Brotherhood of Locomotive Engineers; Brotherhood of Maintenance of Way Employes; Brotherhood of Railroad Signalmen; Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes; Brotherhood Railway Carmen of the United States and Canada (Division of BRAC); Hotel Employees and Restaurant Employees International Union; International Association of Machinists and Aerospace Workers; International Brotherhood of Boilermakers and Blacksmiths, Iron Ship Builders, Blacksmiths, Forgers and Helpers; International Brotherhood of Electrical Workers; International Brotherhood of Firemen and Oilers; International Longshoremen's Association; National Marine Engineers Beneficial Association; Railroad Yardmasters of America (Division of UTU); Seafarers International Union of North America; Sheet Metal Workers' International Association; Transport Workers Union of America; and United Transportation Union; Plaintiffs,
v.
SOO LINE RAILROAD COMPANY, Defendant.
Civ. 4-86-961.
United States District Court, D. Minnesota, Fourth Division.
July 6, 1988.
*803 John O'B. Clarke, Jr., Highsaw & Mahoney, Washington, D.C., for plaintiffs.
Linzey D. Jones, Sidley & Austin, Chicago, Ill., and Patrick J. McPartland, and Barry McGrath, Soo Line R. Co., Minneapolis, Minn., for defendant.

MEMORANDUM OPINION AND ORDER
DIANA E. MURPHY, District Judge.
Plaintiffs are rail labor organizations that brought this action on behalf of their members against defendant Soo Line Railroad Company (Soo) under the Railway Labor Act (the Act or RLA), 45 U.S.C. §§ 151 et seq. Plaintiffs seek to compel defendant to continue to participate in national employee benefit programs and to continue in national bargaining as to those programs. Jurisdiction is alleged pursuant to 28 U.S. C. § 1337(a). Plaintiffs seek both declaratory and injunctive relief. Soo filed a counterclaim, asserting that plaintiffs are violating the Act by refusing to negotiate directly with defendant over employee benefits and seeking declaratory and injunctive relief. Now before the court is Soo's motion to dismiss for failure to state a claim or, alternatively, for summary judgment. Soo also moves for summary judgment on its counterclaim.[1]

*804 BACKGROUND
On this motion to dismiss or for summary judgment, the court views the facts in the light most favorable to plaintiffs. Since 1954, rail labor unions and rail carriers have generally negotiated employee benefits on a national basis with designated national bargaining agents negotiating any changes. This is referred to as "national handling." When carriers, including Soo, have participated in national handling, they have ordinarily given a power of attorney to the National carriers' Conference Committee (NCCC) to negotiate on their behalf. The rail labor unions have similarly designated one bargaining agent, such as the Health and Welfare Committee of the Cooperating Railway Labor Organizations (CRLO). These two entities would then bargain over the benefit plans and reach an agreement that would be binding on all participants.[2] Travelers' Insurance Company has issued the national health and welfare policies since 1955.
In early 1984, various rail unions served notices pursuant to 45 U.S.C. § 156 on a number of carriers, including Soo, proposing changes in wage rates, work rules, and benefits under the Travelers' health and welfare policies. The unions requested that each of the carriers designate the NCCC as its bargaining representative. Although it agreed to national handling of the proposals concerning wages and work rules, Soo refused national handling of health and welfare benefits, stating that it would negotiate those benefits "locally." Accordingly, Soo declined to grant its power of attorney to the NCCC with respect to these benefits, as it had done in the past. Soo advised the unions that it wished to negotiate these issues on its own behalf and that it intended to withdraw from the Travelers' policies and develop its own plans through self-insurance.
Soo states that it has now reached agreement with 8 of the 19 local unions representing its employees on self-insured plans that provide superior coverage.[3] Soo continues to pay premiums on the Travelers' policies for its employees whose unions have not agreed to the new plans. The organizations participating in national handling have reached agreements under which proposals are to be submitted to a "Special Committee" which will make nonbinding recommendations. In the meantime, benefits under the national health and welfare programs will be continued. If the recommendations of the Special Committee do not result in an agreement, those parties have the right to resume direct bargaining.
The Railway Labor Executives' Association (RLEA), of which the chief executive officers of plaintiffs are all members, brought an action identical to this one in the United States District Court for the District of Columbia in October 1985. The action was transferred to this district, but was dismissed by the Honorable Harry H. MacLaughlin on the ground that the RLEA lacked standing to bring the action. Railway Labor Executives' Ass'n v. Soo Line R.R. Co., No. 4-86-379 (D.Minn. Dec. 24, 1986). In that action, Soo had moved alternatively to dismiss for failure to state a claim. In an extended footnote, the court stated in dicta that this argument also had "considerable merit." Slip op. at 23 n. 12. By order dated January 27, 1987, the court deleted that footnote in response to a motion made pursuant to Fed.R.Civ.P. 59(e) by the RLEA. Plaintiffs filed this action on December 31, 1986, making the same claim and seeking the same relief. The case was assigned to this court; Judge MacLaughlin declined referral. Soo now moves to dismiss for failure to state a claim or, alternatively, for summary judgment.

DISCUSSION
Under the Act, both carriers and their employees have the duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, *805 rules, and working conditions" in order to avoid any interruption to commerce. 45 U.S.C. § 152 First. By giving notice pursuant to 45 U.S.C. § 156 ("Section 6 notice"), either party can propose a change in their agreement.[4] Under the Act, both carriers and employees have the right to designate their own representatives for bargaining:
Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.
45 U.S.C. § 152 Third.
Plaintiffs allege that Soo has violated the Act by refusing to participate in national handling and by not bargaining over its attempt to withdraw from the national programs. Plaintiffs argue that national handling of the employee benefit plans, under the circumstances here, is obligatory under the Act. Plaintiffs rely heavily upon Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R. Co., 383 F.2d 225, 229 (D.C.Cir.1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968), which stated that "[w]hether [national handling is] obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements." Soo argues that this statement was dicta; plaintiffs disagree. In plaintiffs' view, this case established that a case-by-case approach is appropriate and that national handling may be obligatory in some circumstances.
Plaintiffs argue here that national handling is obligatory in view of the 34-year history of such handling and the circumstances surrounding employee benefits. Plaintiffs do not view defendant as perpetually bound to national handling; rather they state that "in order for the Soo to withdraw from national handling it must serve a separate Section 6 notice on that question and it must bargain with all of the parties involved in national handling before it can withdraw." Plaintiffs' Memorandum at 16.
Defendant Soo argues that this case is really about a party's right to designate its own representative for bargaining, as guaranteed by the Act. In its view, it simply decided not to designate the NCCC as its bargaining representative with respect to employee benefits. Soo asserts that the court should not rely upon the mere dicta of Atlantic Coast Line and argues that subsequent cases noting the dicta have all involved situations where one party began national handling and thereafter tried to withdraw. Here, by contrast, Soo argues that it selected local bargaining at the outset. As a policy matter, Soo contends that carriers will never agree to national handling if it necessarily becomes obligatory thereafter which, Soo suggests, plaintiffs' theory would require. Finally, even if the Atlantic Coast Line test were applicable, Soo argues that the subject of health and welfare benefits does not require uniform national handling.
With respect to its counterclaim, Soo argues that plaintiffs have violated the Act by refusing to negotiate with it on a local basis and by attempting to abrogate agreements already reached between it and some of the unions. Soo therefore seeks an order requiring plaintiffs' designated representatives to negotiate directly with it. Plaintiffs respond that they had no duty to negotiate directly with Soo because Soo has never served its own Section 6 notice proposing to withdraw from the national plans.
Two procedural aspects to bargaining may be distinguished. The first is who will represent the parties at the bargaining table, and the second is where it will take place. Soo focuses on the former, stressing its freedom to designate its representative and arguing that "[t]he situs of [the] negotiations is irrelevant." Defendant's Memorandum at 7 (Feb. 1, 1988). Plaintiffs *806 stress the latterwhether bargaining will occur on a national or local level.
With respect to the first procedural aspect  choice of representativethe language of the Act explicitly guarantees each party's right to select its own representative "without interference, influence, or coercion." 45 U.S.C. § 152 Third. Under the Act, Soo therefore could not be required to designate the NCCC to negotiate on its behalf. Indeed, plaintiffs virtually acknowledged that fact by "respectfully requesting" Soo to designate the NCCC as its representative. See, e.g., Letter of Brotherhood of Maintenance of Way Employes (April 2, 1984) (Exhibit 2 to Affidavit of Charles W. Nelson). Moreover, Soo cannot be required to bargain over its choice of representative because that right is protected by § 152 Third and because that topic would not appear to come within the language of § 152 First ("rates of pay, rules, and working conditions").
The second procedural aspect is more complicated. The parties have not provided a precise definition of "national handling." It appears that it would normally encompass centralized negotiations between two bargaining representatives, each of which represents more than one carrier or union, that result in a single agreement that applies to all of the participants. At times, however, it appears that a single carrier or union may bargain with the collective representative of the other side. See Affidavit of Charles W. Nelson, paragraph 21 (rail unions have sometimes bargained separately with the NCCC). If this latter situation is considered to be national handling, then an organization's selection of its bargaining representative is independent from its choice whether to engage in national handling. Soo's right to select its bargaining representative therefore does not resolve the question whether it is obligated to participate in national handling. That is, it is possible that Soo, even if it chose to represent itself, may have been required to participate in centralized negotiations with a coordinated labor bargaining representative such as the CRLO, as well as with the NCCC.[5]
The parties have devoted much of their efforts to debating the relevance of Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R. Co., 383 F.2d 225 (D.C.Cir. 1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). In that case, the district court held that the Act authorized a group of carriers to insist upon national handling of negotiations over the issue of "crew consist." After examining the history of bargaining over that issue, the D.C. Circuit reversed, holding that national handling was not obligatory. The court explained:
The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements. The history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue.
Id. at 229. Plaintiffs argue that the Atlantic Coast Line ruling has been applied in a number of subsequent decisions, citing Delaware & Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603, 609 (D.C. Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971); General Comm. of Adjustment GO-377, United Transp. Union v. Grand Trunk Western R.R. Co., No. 86-CV-70036-DT (E.D.Mich. June 12, 1986); United Transp. Union v. Burlington N. Inc., 325 F.Supp. 1125, 1131 (D.D.C.1971); International Ass'n of Machinists & Aerospace Workers v. National Ry. Labor Conference, 310 F.Supp. 905, 912 (D.D.C.1970), appeal dismissed, 463 F.2d 872 (D.C.Cir.1972); and Chicago, Burlington & Quincy R.R. v. Railway Employes' Dept., 301 F.Supp. 603, 607 (D.D.C. 1969).
*807 A review of these cases, however, reveals that courts have found national handling to be obligatory only after the parties had commenced national bargaining and then one attempted to withdraw or take action inconsistent with national handling.[6] For example, in Chicago, Burlington & Quincy R.R., the court found national handling to be obligatory but explicitly relied upon the fact that national bargaining had already commenced:
Having recognized the National Railway Labor Conference and the Eastern, Western and Southeastern Carriers' Conference Committees as the national representative of the carriers, the unions are not now free to compel the Burlington Railroad to bargain with them on a unilateral basis and thus break up the established multiemployer bargaining unit.
301 F.Supp. at 607. The factual situations in the remaining cases cited by plaintiffs are similar. See, e.g., International Ass'n of Machinists & Aerospace Workers, 310 F.Supp. at 912 ("Having begun on a national level, it is incumbent upon the parties to continue to deal on a national level even after the procedures of the Railway Labor Act have been exhausted.").
These rulings are consistent with the National Labor Relations Act (NLRA) principle that withdrawal from multiemployer bargaining units may not be restricted prior to the commencement of bargaining.[7] In Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 410-11, 412, 102 S.Ct. 720, 724, 725, 70 L.Ed.2d 656 (1982), the Supreme Court explained:
These rules, which reflect an increasing emphasis on the stability of multiemployer units, permit any party to withdraw prior to the date set for negotiation of a new contract or the date on which negotiations actually begin, provided that adequate notice is given.... The Board has recognized the voluntary nature of multiemployer bargaining. It neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining.
Here, it is undisputed that Soo notified plaintiffs of its intention to bargain locally before the national bargaining commenced. As such, the present situation is distinguishable from those in the cases cited by plaintiffs. No decision has been identified that required a party to engage in national bargaining under similar circumstances. The Act itself fails to recognize or address the issue of national handling in any fashion whatsoever. This statutory silence, the lack of precedent imposing national handling under these circumstances, and the treatment of withdrawal from multiemployer bargaining units under the NLRA all indicate to the court that national handling should not be imposed here.[8]
Plaintiffs' contention that Soo failed to serve a required formal Section 6 notice concerning its proposal to develop its own health and welfare plans is unpersuasive. Although the precise requirements for a Section 6 notice are not clear, it appears that courts have approached such notices from a functional, rather than a merely technical, perspective. In Pullman Co. v. Order of Ry. Conductors & Brakemen, 316 F.2d 556, 562 (7th Cir.), cert. denied, *808 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963), the court stated:
We believe that a Section 6 notice is adequate if it informs a party of the purpose sought to be attained by the other party with sufficient definition to enable the former to understand the implications of the notice and proposed means adapted to the goal's attainment.
See also Brotherhood of R.R. Trainmen v. Southern Ry. Co., 393 F.2d 303, 309 (5th Cir.1968). Under this standard, Soo's response to plaintiffs' Section 6 notices functionally served as a Section 6 notice itself. Plaintiffs do not claim, and could not reasonably claim, that they were unaware of Soo's proposal.
Even if the Atlantic Coast Line standard were applicable and the court could require national handling, plaintiffs have failed to show that national handling would be obligatory under these circumstances. Atlantic Coast Line states that the "practical appropriateness of mass bargaining" and the "historical experience" of bargaining on that issue should be considered. It is far from clear that national handling is the most practically appropriate manner in which to handle bargaining over health and welfare benefits. It is undisputed that Soo has reached agreements with 8 of its 19 local unions that appear to provide benefits superior to those provided by the Travelers' plans. See Affidavits of Stuart J. Nelson, Edward W. Barsness, and Al Procopio, Jr. Although many carriers have participated in national handling and the Travelers' plans, the practice has not been uniform. Numerous carriers have declined to authorize the NCCC to negotiate on their behalf and a number of railroads have discontinued participation in the Travelers' policies. See Affidavit of Charles W. Nelson paras. 23-30. On the record before the court, Soo is entitled to summary judgment on plaintiffs' claims. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2252, 91 L.Ed.2d 265 (1986).
Although Soo's motion for summary judgment on plaintiffs' claims should be granted for the reasons stated, its motion for summary judgment on its counterclaim should be denied. The parties have largely focused on plaintiffs' claims to the exclusion of Soo's counterclaim. The merits of the counterclaim, if any, are not clear on the record provided. Since Soo has not shown that it is entitled to summary judgment, this motion should be denied.
The motion deadline in this case is now past; the case is theoretically ready for trial. Counsel should submit letters to the court by July 25, 1988 discussing how they propose the litigation should proceed in light of this opinion. Counsel should state their positions on whether the motion deadline should be extended; what issues of fact, if any, remain; and how the final issues in this case may best be resolved.

ORDER
Accordingly, based upon the above and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:
1. Defendant's motion for summary judgment is granted, and the complaint is dismissed.
2. Defendant's motion for summary judgment on its counterclaim is denied.
3. Counsel are to respond on the issues raised in the opinion's last paragraph by July 25, 1988.
NOTES
[1] On January 14, 1988, the court ordered the parties to respond to six questions dealing with the factual background and legal issues. Each party then submitted a response and a memorandum in reply to the response of the other. These were received by February 16, 1988.
[2] At least some of these agreements provided, however, that they are to be construed as separate agreements between the individual carriers and unions. See, e.g., Agreement Between NCCC and Brotherhood of Railroad Signalmen Art. XIV, § 2(a) (Jan. 8, 1982) (Exhibit 33 to Affidavit of Charles W. Nelson).
[3] This constitutes only 10 percent of its employees, according to plaintiffs.
[4] Labor agreements in the railway industry are usually of unlimited duration. They often contain "moratorium" clauses, however, that preclude proposals for change for limited periods. Declaration of Richard I. Kilroy para. 7.
[5] That is, if other carriers had given their power of attorney to the NCCC.
[6] For example, in two of the cases the issue was "whether, after national handling of a dispute has failed to produce an agreement, a strike against an individual carrier who has been part of the multi-employer bargaining unit is legal." International Ass'n of Machinists & Aerospace Workers, 310 F.Supp. at 911; see also United Transp. Union, 325 F.Supp. at 1125.
[7] Plaintiffs contend that this principle cannot be applied in the Railway Labor Act context because of the unique nature of rail labor agreements. Although NLRA decisions are not binding precedent in this area, they may be instructive. See, e.g., Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 574-75, 91 S.Ct. 1731, 1734, 29 L.Ed.2d 187 (1971) (comparing duty to "maintain agreements" under RLA with duty to "bargain in good faith" under NLRA). Plaintiffs themselves have relied upon NLRA precedent. See Plaintiffs' Memorandum at 12-13 (Feb. 1, 1988).
[8] Moreover, as a policy matter, the imposition of obligatory national handling based merely on past participation in such bargaining would likely discourage parties from engaging in national handling in the first place. See RLEA v. Soo Line R.R. Co., No. 4-86-379, slip op. at 22-23 (D.Minn. Dec. 24, 1986).