891 F.2d 675
 133 L.R.R.M. (BNA) 2081, 58 USLW 2388,
113 Lab.Cas. P 11,698
 AMERICAN RAILWAY AND AIRWAY SUPERVISORS ASSOCIATION,
(DIVISION OF BRAC); Brotherhood of Locomotive Engineers;
Brotherhood of Maintenance of Way Employes; Brotherhood of
Railroad Signalmen; Brotherhood of Railway, Airline and
Steamship Clerks, Freight Handlers, Express and Station
Employes; Brotherhood Railway Carmen of the United States
and Canada (Division of BRAC); Hotel Employees and
Restaurant Employees International Union; International
Association of Machinists and Aerospace Workers;
International Brotherhood of Boilermakers and Blacksmiths,
Iron Ship Builders, Blacksmiths, Forgers and Helpers;
International Brotherhood of Electrical Workers;
International Brotherhood of Firemen and Oilers;
International Longshoremen's Association; National Marine
Engineers Beneficial Association; Railroad Yardmasters of
America (Division of UTU); Seafarers International Union of
North America; Sheet Metal Workers' International
Association; Transport Workers Union of America; and
United Transportation Union; Appellants,
v.
SOO LINE RAILROAD COMPANY, Appellee.
 No. 88-5350.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 8, 1989.
Decided Dec. 13, 1989.
 
 Richard S. Edelman, Washington, D.C., for appellants.
 Barry McGrath, Minneapolis, Minn., for appellee.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 LAY, Chief Judge.
 
 
 1
 This is a suit seeking declaratory and injunctive relief to require national bargaining[1] over the proposed modification of health and welfare benefits between eleven rail unions and Soo Line Railroad Company. The district court[2] granted summary judgment in favor of the railroad, and the unions appeal. We affirm.
 
 Background
 
 2
 In early 1984, the unions, pursuant to section 6 of the Railway Labor Act (RLA or the Act), 45 U.S.C. § 156 (1982), served notice on the railroad that they intended to request changes in pay rates, work rules, and benefits, including health and welfare plans, covering railroad employees. Since 1955, the parties have jointly subscribed to national, industry-wide health and welfare plans. Various modifications of these plans were made over the years through national bargaining agents.[3] In 1985, the three existing health and welfare plans covered approximately 320,000 active employees and some 9500 retired employees on 242 railroads.
 
 
 3
 When the unions requested the latest modifications, Soo refused to negotiate health and welfare matters on a national basis. Soo informed the unions that it intended to negotiate these matters locally, and that it intended to withdraw from the national plans and develop its own plans through self-insurance.
 
 
 4
 The unions insist that under the Act the railroad is obligated to participate in national bargaining over the proposed changes in the health and welfare plans. They argue that Soo may not even attempt to negotiate a withdrawal from the national plans without first serving a section 6 notice to negotiate a withdrawal from the national bargaining process itself.
 
 
 5
 The district court rejected this argument on the ground that national bargaining had not yet commenced, relying on cases interpreting the National Labor Relations Act (NLRA). See, e.g., Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).[4] The unions argue that NLRA case law does not apply, citing fundamental differences between the NLRA and the RLA. The unions contend that the district court erred in failing to recognize that whether national bargaining is obligatory under the RLA depends not upon whether such bargaining has commenced, but rather, on (1) the nature of the issue, and (2) the history of bargaining on that issue. See Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R., 383 F.2d 225 (D.C.Cir.1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968).[5] The unions argue historical bargaining practice and the importance of the health and welfare coverage mandate continued national bargaining on the issue.[6]
 
 
 6
 The railroad counters that since a new round of national bargaining has not yet commenced, it is not obligated to bargain through a national representative. Compelling it to do so, the railroad contends, would contravene section 2 of the Act which provides each party the freedom to select its own bargaining representative. See 45 U.S.C. § 152 Third. The railroad argues that the right to select its own representative provides the correlative right to bargain on a local basis and not be bound by any national agreement to which it is not a party.
 
 
 7
 The unions insist the railroad merely confuses the issue in basing its argument on the basic statutory right to select its own representative. The unions acknowledge that right, but urge that unless the railroad negotiates its way out of national bargaining it must accept the agreement reached by the national negotiators.
 
 Discussion
 
 8
 Whether it is dicta as the railroad argues or holding as the unions maintain, we are not convinced that the two-part test suggested in Atlantic Coast Line can be applied here. The unions are correct that the Act's mandate to "exert every reasonable effort to make and maintain agreements," see 45 U.S.C. § 152 First, imposes upon the railroad an affirmative duty to negotiate in good faith with the unions. See, e.g., Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 574-75, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 724-25, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) (duty applies to grievances and major disputes). Repeating the district court's observation, however, we are aware of no decision that construes this duty to obligate the railroad to bargain for a national contract through a national bargaining representative. The unions' argument ignores the statutory right of each party to designate a representative with whom the other party's representative must negotiate.
 
 
 9
 The RLA clearly states that both carriers and employees have the right to designate their own representatives for bargaining:
 
 
 10
 Representatives, for the purposes of this Act, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this Act need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.
 
 
 11
 45 U.S.C. § 152 Third. See also 45 U.S.C. § 152 Fourth ("Employees shall have right to organize and bargain collectively through representatives of their own choosing."). The Supreme Court has characterized this right to choose as the "essential foundation" of the Act:
 
 
 12
 Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme. All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the Act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained.
 
 
 13
 Texas & New Orleans R.R. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 569, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). No existing agreement or statutory provision obligates the railroad to designate a national, multi-carrier representative to conduct its negotiations. The railroad may bargain solely on its own behalf.[7] The unions appear to concede this and yet continue to argue as if it is not so.
 
 
 14
 The Bonanno Linen line of cases recognizes a limited exception to this basic right of choice in situations where one of the negotiating parties attempts to withdraw from multi-party bargaining after negotiations have begun. See, e.g., Bonanno Linen, 454 U.S. at 410-11 & n. 5, 102 S.Ct. at 724-25 & n. 5 (citing cases following this exception). Prior to the commencement of negotiations, the parties remain free to withdraw from their respective bargaining coalitions. Id. at 412, 102 S.Ct. at 725. As the district court aptly pointed out, several of the cases cited by the unions in support of their argument can be read as applying these principles to bargaining under the RLA. See American Ry. & Airway Supervisors Ass'n v. Soo Line R.R., 690 F.Supp. 802, 807 & n. 6 (D.Minn.1988) (citing United Transp. Union v. Burlington Northern, Inc., 325 F.Supp. 1125, 1131 (D.D.C.1971); International Ass'n of Machinists & Aerospace Workers v. National Ry. Labor Conference, 310 F.Supp. 905, 912 (D.D.C.1970); Chicago, Burlington & Quincy R.R. v. Railway Employees' Dept., 301 F.Supp. 603, 607 (D.D.C.1969)); accord Delaware & Hudson Ry. v. United Transp. Union, 450 F.2d 603, 610-11 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).
 
 
 15
 The unions argue that the Bonanno Linen principles are inapplicable here because of the unique nature of railroad labor contracts. Railroad labor contracts, unlike contracts under the NLRA, are perpetual in duration and are subject to modification only after predetermined moratorium periods. Thus, the unions apparently argue, the parties' obligations to participate in the national bargaining process continue indefinitely, or at least until the party desiring to withdraw serves notice and goes through the bargaining procedures mandated by the Act. We disagree. The clear import of the RLA is that each proposal for modification under section 6 initiates a new, distinct set of negotiations for which the parties are free to select new bargaining agents.[8] See 45 U.S.C. § 156. To conclude otherwise would, in effect, perpetually bind a carrier (or a union) to national representation once it agrees to such representation for a particular bargaining round. We agree with the district court that, as a policy matter, this would have the negative effect of discouraging parties from utilizing the national bargaining tool in the first place. See Soo Line, 690 F.Supp. at 807 n. 8. In any event, we believe the Act speaks to the issue with adequate clarity, and conclude therefore that the Bonanno Linen principles are applicable here. Because a new round of national bargaining had not yet begun when Soo announced its intention to bargain locally, nothing prevents it from withdrawing from its national negotiating coalition.
 
 
 16
 We also cannot accept the unions' argument that the railroad must serve section 6 notice of its intent to withdraw from national bargaining, and that it first must bargain over this "change." The selection of a bargaining agent is not a subject of mandatory bargaining under the Act. Nor is it a term in any existing agreement. It is a right reserved to the parties by the Act. The unions' argument that the railroad must serve notice and bargain over its decision to withdraw from national bargaining simply reads too much into the railroad's obligations under the Act and too little into its rights under the Act.
 
 
 17
 We emphasize that the right to designate a bargaining representative applies equally to both sides of the negotiating table; each side is obligated to "treat" with the other's designee. See, e.g., Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 547-48, 57 S.Ct. 592, 599-600, 81 L.Ed. 789 (1937). Indeed, the individual unions may seek to achieve significant bargaining power by coordinating their negotiating efforts. See Wagner, Multi-Union Bargaining: A Legal Analysis, 19 Lab.L.J. 731, 738 (1968) (discussing multi-union collective bargaining under the NLRA). The unions to some degree control their own destiny. If they splinter, as some already have done,[9] then separate agreements appear to be the order of the day. If the unions select a single representative, then that representative may lawfully insist that the same contract terms be applied to all unions that have given their prior approval.[10] In either case, the unions have the right to bargain for terms that match or exceed those of the current health and welfare plans. The railroad, of course, may in good faith attempt to bargain to secure a series of plans with individualized terms. Whether this bargaining will be objectively appraised as being in good faith will depend on many variables and uncertainties not at issue here.
 
 Conclusion
 
 18
 In sum, we find that the railroad has no duty under the RLA to give notice to negotiate its withdrawal of a national bargaining representative. The railroad has a statutory right to designate its own representative; it has no obligation to accept national bargaining and is not bound by national negotiations in which it chooses not to participate.[11] 1] Correlative to this right, the railroad does have a duty to bargain with the representative or representatives so designated by the unions; it must bargain in good faith as to the terms and conditions of health and welfare coverage of the various employees represented by the union representatives.
 
 
 19
 For the reasons set forth herein, we find that the plaintiffs are not entitled to declaratory or injunctive relief. The judgment of the district court is therefore affirmed.
 
 
 
 [1]
 National bargaining, or "national handling" as it is called in the railroad industry, refers to the collective bargaining practice whereby railroads and unions give bargaining authority to multi-carrier and multi-union committees, agreeing in advance to be bound by a national agreement reached by the two committees
 
 
 [2]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota
 
 
 [3]
 Generally the bargaining agents have been the Health and Welfare Committee of the Cooperating Railway Labor Organizations for the employees, and the National Carriers' Conference Committee for the railroads. The various agreements reached by these negotiators were of unlimited duration but contained moratorium clauses which precluded changes over a period of time
 
 
 [4]
 Bonanno Linen held that the National Labor Relations Board (NLRB) could prevent an employer from withdrawing from a multiemployer bargaining unit once bargaining had commenced, notwithstanding an impasse in negotiations. The Court, however, acknowledged with approval the NLRB's policy of allowing unrestricted withdrawal prior to the commencement of bargaining, stating that such a policy "recognized the voluntary nature of multiemployer bargaining." 454 U.S. at 412, 102 S.Ct. at 725
 
 
 [5]
 The issue in Atlantic Coast Line was whether a union had breached its duty to bargain by refusing to negotiate with a multi-carrier representative. See Atlantic Coast Line R.R. v. Brotherhood of R.R. Trainmen, 262 F.Supp. 177, 184-85 (D.D.C.), rev'd, 383 F.2d 225 (D.C.Cir.1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). The lower court, relying on section 2 of the Act, held that the union was obligated to negotiate with the multi-carrier representative. Id. at 187-88. The court of appeals reversed on the ground that the particular issue at hand had traditionally been negotiated on a local, rather than national, level. 383 F.2d at 229. The court went on to state the following:
 What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements.
 Id.
 
 
 [6]
 The union does not contend that a section 6 notice under the Act is necessary on the ground that it is a modification of the collective bargaining agreement to sever the health and welfare issue from negotiation of wages and working conditions which are still authorized for national bargaining. This complex question is not briefed and our holding does not consider such a contention
 
 
 [7]
 Until such bargaining is completed and the steps required by the Act exhausted, of course, Soo must continue to fulfill its obligations under the existing agreements. Indeed, the unions conceded at oral argument that Soo has done so. Soo is still paying premiums, and maintains the health and welfare coverage last agreed upon
 
 
 [8]
 The past practice in the industry also supports this. Each time the unions have served section 6 notices on the carriers, they have requested the carriers to designate the NCCC or a similar group as their representative
 
 
 [9]
 Eight of Soo's nineteen unions have already independently negotiated for and agreed to new health and welfare plans
 
 
 [10]
 Cases interpreting the NLRA are instructive and support this point. See General Electric Co. v. NLRB, 412 F.2d 512, 519 (2d Cir.1969) (upholding NLRB's determination that unions do not commit unfair labor practices by insisting that employer bargain with mixed-union negotiating committee); Standard Oil Co. v. NLRB, 322 F.2d 40, 44-45 (6th Cir.1963) (same); United States Pipe & Foundry Co. v. NLRB, 298 F.2d 873, 877-78 (5th Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1557, 8 L.Ed.2d 499 (1962) (three unions may insist adamantly on identical terms in each of three separate labor contracts)
 
 
 [11]
 The railroad concedes, however, that it does not argue over the situs of the negotiations, and is willing to negotiate in Washington, D.C. or another reasonable place chosen by union representatives